UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOWLERS' ALLEY, INC.,

    Plaintiff,        Case Number 13-13804

v.                Honorable David M. Lawson

THE CINCINNATI INSURANCE
COMPANY,

    Defendant.
_____/

## OPINION AND ORDER ON MOTION TO ADD EXPERT WITNESS AND MOTIONS *IN LIMINE*

In this breach-of-insurance-contract case, the parties have filed motions for orders to preclude various liability and damage expert witnesses from testifying. The Court held a hearing on all of the motions on April 22, 2015. For the reasons that follow, the Court will deny the plaintiff's motion to add Donald Gracey as an expert witness, grant in part and deny in part the plaintiff's motion to exclude the testimony of Robert Walworth, grant the plaintiff's motions to exclude the testimony of Kenneth Deback and Mark Shasko, grant the defendant's motions to exclude the testimony of Randall Bernard and Michael Hale, and grant in part and deny in part the defendant's motion to exclude the testimony of James O'Brien.

## I. Donald Gracey

On December 9, 2014, the plaintiff filed a motion to modify dates in the scheduling order to allow it to serve a late disclosure of its proposed expert witness Donald Gracey, or in the alternative to name Gracey as a rebuttal expert. Under the Court's scheduling order, the plaintiff's expert disclosures were due on September 30, 2014, and the defendant's disclosures were due on October 30, 2014. The plaintiff asserts that it served a copy of Gracey's report on the defendant on

October 29, 2014.  Other than as to Mr. Gracey, the parties timely served their disclosures on the respective dates.  The plaintiff contends that good cause exists for a modification of the scheduling order and that the defendant will not be prejudiced by the late disclosure.  The Court disagrees.

Mr. Gracey identifies himself in his report as a Master Electrician, licensed in the State of Michigan, with 41 years of experience as an electrical contractor and electrical project engineer.  He says that he inspected light fixtures at the plaintiff's facility on October 10, 2014.  He offers the following conclusions:

> The mass failure of [the plaintiff's] lights likely occurred when the building was saturated with water, and the light fixtures were wet from condensation.  Condensed water has no minerals present, therefore there is no corrosion or residue present.  The lights were used while they were wet from condensation, immediately after the damage occurred.  The condition of the lighting system deteriorated due to condensation on the fixtures, and the higher operating voltage used (277 volts).  The current condition of the lighting system is not from normal end of life issues [such as] burned out bulbs and ballasts.
> . . .
> Condensation on the ballast and the light fixture provided an alternative path of electricity from the 277 volt source, applying excessively high voltage, and current levels, burning out the ballast, and the bulbs.

Plf.'s Mot. [dkt. #60], Ex. 4, Expert Report of Donald Gracey at 2 (Pg ID 2045).  Gracey based those conclusions on his inspection of six light fixtures, which revealed no "evidence of corrosion," as well as on his observations that (1) there was no apparent damage to the electrical panels serving the lights; (2) "about 15 out of approximately 400 lights [were] operating" at the time of his inspection; and (3) "short circuiting with arcing [] has been observed in three light fixtures."  *Ibid.*

The plaintiff contends that "Mr. Gracey's testimony is uniquely significant to Plaintiff's case in light of his credentials and the fact that he has performed a first-hand, up-close examination of the nature and extent of the damage to the overhead lighting system and equipment."  It argues that good cause exists to excuse its late disclosure because "[d]espite Plaintiff's diligence in attempting

-2-

to secure Mr. Gracey as an expert prior to its expert disclosure deadline on September 30, 2014, Mr. Gracey was unavailable to perform an inspection of the property until October 10, 2014."

The defendant responds that the plaintiff has offered no explanation for why it waited until the eve of the expert disclosure deadline to attempt to retain Mr. Gracey and why it could not have arranged for a timely inspection at any time within the more than two years that passed between the date of the water event in May 2012 and the disclosure deadline in September 2014. The defendant further argues that Gracey's stated opinions would be inadmissible because they are speculative at best, since he did not inspect the lights until October 2014, more than 2-1/2 years after the water event. Moreover, there was another water event on February 1, 2014, when the Essexville fire department responded to a call regarding the building to find that a sprinkler pipe had frozen and burst inside, which resulted in the flooding of the property, with "several inches of water/ice in the parking lot and in the building interior, including over all of the bowling lanes." The defendant contends, therefore, that Gracey could not opine plausibly that the condition of the lights observed in October 2014 was solely due to a water incursion in May 2012.

The plaintiff has not suggested any reason at all why it could not have timely retained and disclosed an electrical expert in the more than two years between May 2012 and September 2014. The plaintiff contends that its last-minute disclosure was compelled by the defendant's "nonsensical persistence" in the position that the damage to its light fixtures was not caused by the May 2012 water incursion. But the plaintiff was aware of the defendant's position on the cause of the lighting failures, at the latest, on July 17, 2013, when Cincinnati responded to the plaintiff's interim sworn proof of loss with a letter denying coverage for light fixture replacements, and specifically citing the

-3-

conclusions of its expert, Kenneth DeBack, who opined that damage to the lights did not result from the water event.

Moreover, in light of the occurrence of a second, apparently even more extensive flooding of the building in February 2014, Gracey's opinion regarding failure of the lights due to water damage could not possibly be rendered on a reliable basis, since he did not — and evidently cannot — distinguish between damage to the lights that may have occurred after the 2012 event versus similar damage that may have occurred after the 2014 event. Even without the intervening event, the plaintiff has not established any basis for finding that Gracey could opine reliably about the cause of lighting failures in 2012, based on an inspection conducted in 2014, and Gracey did not give any reasons in his report to explain why the condition of the lights in 2014 reliably could be presumed accurately to reflect the cause of their failure two years earlier. The plaintiff's engagement and disclosure of Gracey was not timely, and even if it were, Gracey's opinion does not escape the veil of speculation. The plaintiff's motion to add him as an expert will be denied.

### III. Motions *in limine*

Any challenge to expert testimony must begin with Rule 702 of the Federal Rules of Evidence, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gatekeeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge. Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The language added by the amendment to Rule 702 — subparagraphs (b) through (c) — restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

In addition, expert testimony is not admissible unless it will be helpful to the fact finder. Such testimony is unhelpful when it is unreliable or irrelevant, as the Court observed in *Daubert*, *see id.* at 591-92, and also when it merely deals with a proposition that is not beyond the ken of common knowledge, *see, e.g., Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) ("If everyone knows this, then we do not need an expert because the testimony will not 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting Fed. R. Evid. 702). Finally, before an expert may give an opinion, the witness must be qualified to do so. *See id.* at 1348-50; *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998). The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

An opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert*, 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results. There is no precise formula by which a court might deem a methodology "acceptable" or "unacceptable." *Daubert* and its progeny therefore have not created a "straitjacket," *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001), but

rather counsel a flexible approach, reconciling the "liberal thrust" of Rule 702, which "relax[es] the traditional barriers to opinion testimony," with the responsibility to "screen[] such evidence" in order to keep unreliable or invalid opinions from the jury. *Daubert*, 509 U.S. at 588-89; *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000). "Although there is no 'definitive checklist or test' to strike th[e] balance ['between a liberal admissibility standard for relevant evidence . . . and the need to exclude misleading junk science'], the *Daubert* Court set forth factors relevant to the inquiry: (1) whether the theory or technique can be or has been tested; (2) whether it 'has been subjected to peer review and publication'; (3) whether there is a 'known or potential rate of error'; and (4) whether the theory or technique enjoys general acceptance in the relevant scientific community." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011); *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). Other factors may play a role as well. *See Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 712-13 (E.D. Mich. 2003).

The Sixth Circuit has held that an expert's opinion may become speculative and unreliable where it depends on too long a chain of "inferences upon inferences." In *Tamraz v. Lincoln Electric Company*, 620 F.3d 665 (6th Cir. 2010), the plaintiff exhibited the symptoms of Parkinson's Disease, and his physicians offered the opinion that he suffered from "manganese-induced parkinsonism" that he incurred when working as a welder and was exposed to the defendants' products. The court of appeals held that the doctor's testimony should not have been admitted at trial because it was based at most on a working hypothesis that itself was the product of a chain of inferences that themselves were grounded in speculation instead of the facts of the case. Plausible though it was, the court could not accept the conclusion that the magnesium in the defendants' products caused the plaintiff's symptoms. *Id.* at 670-71 (asserting that "[t]he final step required a

-6-

leap of faith as well, even ignoring the jumps required to get there. That manganese *could cause* Parkinson's Disease in someone like Tamraz does not show that manganese *did cause* Tamraz's Parkinson's Disease"). The court viewed the opinion as the last step in a chain of inferences that were each based on some measure of speculation, concluding that "[a]t some point, the train becomes too long to pull and the couplings too weak to hold the cars together." *Id.* at 672.

Nonetheless, "rejection of expert testimony is the exception, rather than the rule, and [the court] will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008) (internal quotations and citations omitted).

With these general principles in mind, the Court will turn to the challenges to the several witnesses.

### A. Robert Walworth

Robert Walworth, a Certified Public Account with 31 years of experience, has submitted a report on the integrity of the financial statements the plaintiff submitted to the insurance company to support its business loss claim. Walworth offered the following conclusions:

> The Plaintiff presented a false and misleading Financial Statement for the nine months ended May 31, 2012, which materially overstates the profits of Bowlers Alley, Inc.

> Essentially every objective indicator of activity for the nine months ended May 31, 2012 contradicts the profitability reflected on this Financial Statement. The objective indicators of activity instead are consistent with the premise that the Plaintiff suffered a sharp decline in sales, and was continually incurring losses.

> This Financial Statement was submitted to the Defendant, Cincinnati Insurance Company, in connection with the claim for Business Income loss, and was provided to me by Adjuster Scott Whaley.

> If relied upon and used by the Defendant as presented as the basis for determining Loss of Business Income, there would have been a material overpayment of Business Income proceeds.
>
> Due to the misstatement of financial data in the period of time leading up to the date of loss, a calculation of Business Income loss with any degree of accounting certainty is not possible.  While the amount of Continuing Expenses can be ascertained, the projected net profit or loss cannot be determined with any reasonable degree of certainty due to the false and misleading information submitted.
>
> It is my opinion that the Plaintiff operated at a significant net operating loss from September 2011 through May 2012, the business was declining significantly, and would have continued to operate at a significant net loss throughout the Period of Restoration.

Plf.'s Mot. [dkt. #111], Ex. 6, Expert Report of Robert Walworth dated Nov. 10, 2014 at 2-3 (Pg ID 5671-72).  Walworth based his conclusions on his review of accounting and financial records and reports for the period 2009 through 2012 that were disclosed by the plaintiff, including its tax returns, bank statements, general ledgers, monthly sales sheets and petty cash registers, expense invoices, and working papers and financial statements prepared by plaintiff's accountant James O'Brien, along with various deposition transcripts and other documents collected during the course of the litigation.

The plaintiff argues that Walworth's opinion that the May 2012 statement was false and misleading is immaterial because the Court found the defendant's allegations of "fraud" in the counter-complaint to be implausible and insufficient as a matter of law, the Court's previous order dismissed the counter-claim to that extent, and it also implicitly dismissed the defendant's affirmative defense based on the same facts.  The plaintiff also argues that Walworth's opinion is unreliable because he disregarded numerous indications in the financial records contrary to his opinions, and also failed to account for cyclical and seasonal influences on the plaintiff's business cycle, such as the operation of tournaments and leagues.

-8-

The defendant responds that the plaintiff's arguments attack the weight, not the admissibility, of the opinions. The defendant contends that Walworth's testimony is relevant because the Court never dismissed the counter-claim for breach, or any part of it, and did not dismiss the affirmative defense based upon the same factual basis and policy provisions.

The Court previously dismissed the portion of the defendant's counterclaim alleging fraud and breach of contract based on fraud. The Court also denied the defendant's motion to amend the counterclaim to restate those contentions. Although the Court did not address in those orders the corresponding affirmative defense of fraud, it will do so in its opinion on the cross motions for summary judgment, finding that the defense must fail for the same reasons discussed earlier. Therefore, Walworth's opinions are immaterial to the extent that they essentially serve only to bolster that defense. Moreover, the only specific omission from the plaintiff's May 2012 financial statement that the defendant pointed out in its dispositive motions was the omission of "rents paid" to plaintiff's owner, Patrick Langan, and that premise is insufficient as a matter of law to constitute a misrepresentation of any material fact. Walworth's opinion that the May 2012 financial statement was "false" or "misleading," therefore, will not be helpful to the fact finder and will be excluded.

However, the plaintiff's financial condition may be relevant to other issues — e.g., the amount of consequential damages incurred as a result of an extended business interruption. Walworth is qualified by his training as an accountant to report on his conclusions regarding the defendant's profits and losses (e.g., his "opinion that the Plaintiff operated at a significant net operating loss from September 2011 through May 2012, the business was declining significantly, and would have continued to operate at a significant net loss throughout the Period of Restoration)

-9-

and the general accounting and financial significance of the numbers recorded in the various records and reports that he reviewed. The defendant may offer those opinions at trial.

### B. Kenneth DeBack

Kenneth DeBack identified himself as an professional engineer with over 40 years experience designing electrical and telephone wiring systems. Cincinnati Insurance Company hired him to provide an opinion on the cause of the failure of the overhead lighting fixtures in the bowling alley. DeBack visited the facility on December 26, 2012 and May 17, 2013, but never examined the lights themselves. Nonetheless, his report offers the following conclusions:

1. The water from [the] pipe break was removed from the building on May 18, 2012. Fans were placed on May 18, 2012 to dry out the building. Therefore, the humidity level in the building should have been back to a normal level by the end of May 2012.

2. The lighting problems occurred several months after the humidity level had returned to [a] normal level. Therefore, based upon a reasonable degree of scientific certainty, it is this Engineer's opinion that the lighting problems were not the result of high humidity and/or condensation due to the water leak in May of 2012.

3. No corrosion was observed on any lighting fixtures or receptacles to indicate that there had been a problem with condensation. Therefore, the lighting fixtures and receptacles do not need to be replaced as a result of the water leak that took place in May of 2012.

4. The lighting fixtures that are not working have failed due to age.

Plf.'s Mot. [dkt. #112], Ex. 6, Expert Report of Kenneth DeBack dated May 17, 2013 at 3-4 (Pg ID 5776-77). During his visits, Deback took photographs and recorded the following observations of the electrical equipment and lighting fixtures: (1) on one panel, 5 of 26 breakers serving certain light fixtures were "tripped," and the other 21 breakers were "on"; (2) all 32 breakers serving light fixtures in a second panel were "on"; (3) 80 out of 84 fixtures in the lane area of the facility were

-10-

lit, and four of the fixtures were dark (Deback reported that at the December visit all 84 were lit); and (4) 13 out of 50 fixtures in the "pinsetter" area were lit, compared with 18 out of 50 in December 2012. DeBack also reviewed the August 28, 2012 report prepared by defense expert Mark Shasko, of Nederveld Engineering, from which he drew the observation that ServPro had removed all of the water from the facility and placed fans to dry the place out by May 18, 2012. He also reported an observation by one of plaintiff's other engineering experts (also with Nederveld), that the measured temperature at the floor of the facility was 74 degrees on July 31, 2012.

The plaintiff argues that DeBack's opinion is unreliable and unsupported because (1) DeBack is not qualified to offer an opinion as to whether condensation or humidity caused the light fixtures to fail, since his relevant experience is in design of wiring for telephone systems and fire investigations; (2) DeBack admits that he was not aware of testimony by plaintiff's employee Doug Kruse that he saw "sparks" coming from several light fixtures and that a number of fixtures turned off or would not turn on as early as the week after the water event; (3) DeBack admits that he was not aware of and did not obtain any moisture measurements from inside the building anywhere near the time of the water event, in May 2012, or at any later time; (4) the observation that "no corrosion" was seen on the fixtures is unfounded because DeBack admits that he did not bring a ladder with him and that he could not get close to the fixtures to inspect them during either site visit; and (5) the conclusion that the fixtures "failed due to age" is unfounded because DeBack admits that he has no idea how old they are.

The defendant responds that DeBack is adequately qualified by his general training and experience as an electrical engineer to opine on the cause of failure for electrical fixtures such as fluorescent lights; and his opinion was based on personal knowledge, including observation of the

fixtures from the floor level of the facility during two site visits, and the physical evidence that DeBack did not see any evidence of corrosion or "arcing" on or around most fixtures.

DeBack's conclusions as to the cause of the lighting fixture failures must be excluded because they have no adequate factual basis. "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). DeBack's opinions are faulty because they are based on assumptions that he did not verify himself, and are not otherwise supported in the record. *First*, the conclusion that humidity in the facility would have returned to normal by the end of May 2012 is entirely speculative and based on nothing more than DeBack's assumption that the water removal contractor would have restored conditions to normal before leaving the site. He also admitted that he did not know of any moisture readings from the facility besides those stated in the August 2012 report by Nederveld Engineering.

*Second*, DeBack's conclusion that the fixtures failed "several months" after the event is unsupported by any record fact and contrary to the record itself, because DeBack admits that he "wasn't given the failure date of [the] fixtures" and "never asked" anyone about the date they failed. Moreover, DeBack conceded that his assumption that lighting problems did not occur until October 2012 was a central premise of his conclusions. DeBack stated that if he had known that the light fixtures failed within a week after the water event, then he would have reached a different conclusion; but he discounted Kruse's testimony when he learned of it since DeBack only observed indications of "arcing" around one fixture, and not "all over the ceiling" as Kruse described. DeBack admitted, moreover, that he never inspected the light fixtures over the bowling lane area, because he did not have access to a lift or ladder during either site visit.

-12-

Finally, DeBack's conclusion that the "fixtures failed due to age" is entirely unsupported by any factual basis, because DeBack conceded that he did not know how old the fixtures were or if they were originals or replacements.

This is not a case where a single fact or two contradicts the expert's opinion. *See*, *e.g.*, *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 528 (6th Cir. 2014) (allowing an expert's opinion supported by record facts, even though it contracted the plaintiff's own testimony). Instead, the opinions here are based on unverified assumptions and the expert's belief of what he might have seen if he had examined the lights, which he did not do. "Nothing either in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). DeBack will not be permitted to testify at trial.

### C. R. Bryan Tilden

Mr. Tilden purports to be an expert in the insurance industry for over 40 years. He identifies himself as "an author, broker, consultant, underwriter, drafter of policy forms and endorsements, teacher, historian, claim examiner and consultant for both insureds and insurers." Plf.'s Mot. [dkt. #115], Ex. 4, Expert Report of R. Bryan Tilden at 2 (Pg ID 6059). Mr. Tilden's report offers the following opinions:

> I.   CIC appropriately investigated, adjusted and evaluated available information and considered the interests of its insured, consistent with the custom and practice of the insurance industry.
>
> . . .
>
> II.  CIC did not breach the contract by continuing to request sufficient documentation and information to make claim decisions and reserving its rights under the policy.
>
> . . .
>
> III. Bowlers' Alley did not mitigate its damages because it failed to perform repairs, it is time-barred from collecting replacement cost benefits under the

terms of the policy and coverage for loss related to mold is limited to $15,000.

*Id.* at 4-10 (Pg ID 6061-6067).

All of the "opinions" that Tilden purports to offer embrace ultimate issues central to the disposition of this case, which alone does not render them inadmissible. Fed. R. Evid. 704(a). But his opinions offer legal conclusions, and his determination as to at least the final point is wrong as a matter of law. "[A] witness may not testify to a legal conclusion." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)).

The jury does not need Mr. Tilden's help to decide such dispositive questions as whether Cincinnati acted reasonably in the course of its investigation of the plaintiff's claim, whether the plaintiff is barred from recovering replacement cost benefits because it has not yet completed repairs, and whether coverage for the plaintiff's damaged lanes is constrained by certain provisions of the policy such as the $15,000 limitation on "mold" damage. Expert testimony that "attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions, hardly can be viewed as being helpful to the jury"; exclusion of such testimony therefore also is appropriate "on the ground that it would not be helpful to the trier of fact." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (citing Fed. R. Evid. 702).

R. Bryan Tilden will not be permitted to testify to the opinions set out in his report.

### D.  Mark Shasko

Mark Shasko is a licensed professional engineer retained by the defendant to examine the bowling lanes for damage and opine on the needed repairs. Working for his firm, Nederveld Forensic Engineering, Shasko inspected the plaintiff's facility and prepared a report on the condition

-14-

of the lanes and the options available for repairing them.  Shasko visited the plaintiff's facility twice

in July 2012, conducted a visual inspection of the lanes, and took certain measurements and

photographs.  He also consulted with Jim Lyddy of the Bay Area USBC Bowling Association and

Bill Murrey of Murrey Bowling regarding industry standards for bowling lanes and the results of

previous lane inspections.  The report offers the following conclusions:

> Based on our investigation, it is our opinion that several individual lanes with[in] the
> area of stated water [incursion] currently do not meet the USBC required tolerance
> for crosswise title of 0.040" and require repair.  Per the Bay Area USBC Bowling
> Association lane inspection, lanes 7, 15, and 23 do not meet the requirements for
> crosswise tilt.  The sections of these lanes not meeting the requirement are those
> within the first 15' to 20' south of the foul line.  This area is consistent with the area
> of stated water [exposure].  In addition, Mr. Lyddy indicated that he placed the level
> randomly within the first 3' to 5' of the foul line at lanes 1 to 25 and noted crosswise
> tilt readings from 0.090" to 0.200".
>
> Lanes 15 and 23 did not exhibit similar crosswise tilt measurements based on the
> Bay Area USBC Bowling Association lane assessment performed September 12,
> 2011.  These two lanes met the certification requirements in 2011.
>
> It is our opinion that, based on the documentation provided by the Bay Area USBC
> Bowling Association and the information provided via a phone conversation with
> Mr. Lyddy, it is evident that a significant event, consistent with the stated moisture
> event, has occurred between September 12, 2011 and August 10, 2012 resulting in
> lanes not within the tolerance of the USBC requirements.
>
> It is probable that the application of a synthetic overlay at the lanes will be the most
> cost effective repair option as the current lane thickness may not allow for
> resurfacing and if it [did], the repair process would be labor intensive and likely cost
> prohibitive.  It is likely, whichever repair option is used, [that] the repair will need
> to be performed at all lanes.
>
> Regarding the lane approaches, it is our opinion that the support structure and
> approach lanes have not sustained damage as a result of the water loss.  The dip
> observed near the foul line and the lane centerline is consistent with long-term
> effects of repeated foot traffic from bowlers.

Plf.'s Mot.[dkt. #114], Ex. 6, Expert Report of Mark Shasko dated Aug. 28, 2012 at 3 (Pg ID 5917).

The plaintiff argues that Shasko's opinion should be excluded in its entirety because (1) Shasko stated in his report that his opinion that synthetic overlays would be the most "cost effective" repair method is solely based on his review of the repair estimate prepared by Brian Estes; (2) the evidence as to cost-effectiveness would be needlessly cumulative of testimony on the same subject offered by the defendant's expert witness Jason Fetterly (whom plaintiff has not challenged); and (3) the defendant should be sanctioned under Rule 37(b) and barred from presenting Shasko as a witness because it failed to make him available for deposition until March 10, 2015.

The defendant responds that Shasko "is not being offered to testify about the appropriate measure of damages or even a comparison of the policy to the facts to determine whether such repairs are or are not covered by the policy," because those determinations properly must be made by the Court and the jury. Instead, the defendant contends that "like Plaintiff's experts, Mr. Shashko is being offered to testify regarding the extent of damage observed and the proper means and methods of repair of the bowling lanes to address the cross-tilt variance based on his specialized skills, training and experience dealing with bowling alleys." The defendant argues that Shasko's testimony is not cumulative of that offered by Mr. Fetterly, because Fetterly "will testify regarding his factual observations of the damage as well as the scope of the damage to the lanes," but "Mr. Sashko will opine as to the means and methods necessary to effectuate the repairs," and they therefore will offer complementary, but not overlapping opinions.

Finally, the defendant contends that sanctions under Rule 37(b) are not appropriate under the circumstances, because the delay of Shasko's deposition beyond the February 27, 2015 deadline for filing motions challenging experts was due to scheduling conflicts of both parties, and the plaintiff agreed to the March 10, 2015 date.

-16-

As the defendant points out, the plaintiff does not challenge Shasko's qualifications as an engineer. Shasko certainly is qualified to testify as to his opinions, formed by applying his general training and experience in the field of structural engineering, concerning the extent of the damage to the plaintiff's wood lanes and the need for repairs, and premised upon personal knowledge he obtained about the condition of the lanes during his site visits. Shasko's conclusion that the lanes at least including 15 and 23 were damaged and needed repair is consistent with the findings of plaintiff's own consultant, Brian Estes of Capital Bowling Service, and the similar conclusions of the representative from Brunswick Bowling. Moreover, the plaintiff evidently does not challenge Shasko's opinions on those points, but only his opinion that synthetic overlays would be the most "cost effective" option for repair. However, the defendant's response indicates that it intends to present Shasko solely for the purpose of opining on the most practical means of repair, and that he will not opine on the cause and extent of damage, which will be addressed by Mr. Fetterly.

But on the sole point on which the defendant will offer Shasko's testimony — that "[i]t is probable that the application of a synthetic overlay at the lanes will be the most cost effective repair option" — Shasko's opinion is unsupported by anything in his report, and evidently merely parrots the conclusion expressed by Mr. Estes in his repair estimate. In its initial disclosures, the defendant states, "Mr. Shasko generally concurs with the opinions of Mr. Estes as stated in his July 24, 2012 report and deposition that the proper method of repair was the use of synthetic overlay on lanes 1-40 to get the Plaintiff back in business."

The testimony about "cost effectiveness" is unsupported by anything set out in Shasko's report, and he offers nothing in the way of analysis to substantiate it. Moreover, the question whether synthetic overlays would be more "cost effective" is irrelevant to any material issue in the

-17-

case, because it is undisputed that synthetic overlays can be installed at one-third or less of the cost of new wood lanes. The relevant and dispositive question is not whether synthetic overlays are *cheaper* than wood, but (as will be discussed in a later opinion) whether they are *comparable*. Shasko offers no opinion at all as to the comparative properties of the two lane materials that might inform an answer to that question. Therefore, his opinion as to "cost effectiveness" would be unhelpful, irrelevant, and cumulative to unchallenged record evidence establishing the undisputed fact that synthetic lanes are cheaper.

Because the defendant represents that Shasko has no other relevant testimony that it desires to offer, he will be excluded as a witness in the case.

### E. Randall Bernard

The defendant moves to preclude Randall Bernard from testifying about the cause of the failure of the light fixtures at the plaintiff's facility, on the ground that he is unqualified, and his opinion is based on speculation.

The plaintiff did not disclose any expert report by Mr. Bernard, but it identified him as an electrician who prepared an estimate for replacing the overhead lights in the plaintiff's building. The plaintiff's initial expert disclosures stated that:

> Mr. Bernard [has] knowledge about the extent and cause of the damage to the overhead lighting system at the Property, as well as the necessary remediation measures and appropriate replacement systems and materials that are of comparable quality and material to the damaged systems and materials at the Property. The substance and bases for . . . Mr. Bernard's potential testimony and opinions are set forth, without limitation, in documents BA000235 and BA000275, which have previously been provided to Defendant. . . . Mr. Bernard's expertise is in the areas set forth in those documents, and includes, without limitation, the areas of electrical systems and wiring.

Def.'s Mot. [dkt. #108], Ex. 2, Plf.'s Initial Expert Disclosures dated Sept. 30, 2014 at 4 (Pg ID 5445). The documents cited by the plaintiff are single-page summary estimates prepared by Bernard for replacing lighting fixtures at the bowling alley. The only reference in the estimates to any cause of the damage to the lighting fixtures are single-line notations that read "repair/replace/retro-fit lighting fixtures due to damage from flood." Nothing in the estimates explains how Bernard determined that any "damage" to the fixtures resulted from a "flood" or other water incursion.

Bernard admits that he has no opinion as to what caused the failure of the plaintiff's light fixtures, and no basis on which to form any such opinion. Bernard testified at his deposition that, when he visited the facility, based on "[t]he amount of light fixtures that were burnt out, it seemed there had to be a cause of why that damage was occurring to that many fixtures at once, so there was no reason to doubt [Doug Kruse's statement to Bernard that the failures were due to water damage]." Randall Bernard dep. at 37-38 (Pg ID 4990-91). However, when asked whether he did "any other independent investigation to confirm what Mr. Kruse told [him]" about the cause of the failure, Bernard said that he did not. *Id.* at 39. When confronted with the question, "Really you don't know whether it was caused by water or not, do you?" Bernard answered "No." *Ibid.* Bernard further testified as follows:

> Q. You weren't asked to offer an opinion as to what the cause of the damage was, correct?
> A. Correct. They had their opinion of what had caused the damage.
> Q. And again, you didn't do anything to confirm for yourself that that was correct other than take Mr. Kruse's word for it?
> A. Correct. I seen the lights were not working.

*Id.* at 41. Because Bernard admits that he has no idea what caused the lighting fixtures to fail, and it is apparent that he did no work to determine why the failures occurred, his opinion must be excluded as unsupported by any sufficient factual basis or reliable analysis.

-19-

F.  James O'Brien

James O'Brien is the accountant for the plaintiff's business.  He is a self-employed Certified

Public Accountant who has been regularly retained by the plaintiff to provide accounting services.

In its responses to the defendant's interrogatories, the plaintiff identified O'Brien as an expert

witness and stated that:

> Mr. O'Brien may be called not only as a fact witness regarding the above-referenced
> matters, but also as an expert witness regarding the sufficiency of the information
> Plaintiff provided to substantiate its business interruption claim from an accounting
> perspective, the unreasonableness of Defendant's subsequent requests for
> supplemental information, and the extent of Plaintiff's entitlement to additional
> payments for Plaintiff's business interruption losses.  Mr. O'Brien's expertise is in
> the areas of accounting and finance.

*See* Def.'s Mot. re: Randall Bernard [dkt. #108], Ex. 2, Plf.'s Initial Expert Disclosures dated Sept.

30, 2014 at 8 (Pg ID 5449).  The defendant moves to exclude his testimony in its entirety, alleging

that no proper pretrial disclosure was made and O'Brien in unqualified.

It does not appear that Mr. O'Brien was retained specially as an expert within the meaning

of Federal Rule of Civil Procedure 26(a)(2)(B), and therefore was not required to furnish a report.

*See Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 870 (6th Cir. 2007).  Instead, the plaintiff only was

required to furnish a disclosure under Rule 26(a)(2)(C).  The report quoted above was adequate, as

far as it went, to satisfy that rule.

However, insofar as the plaintiff intends to offer any opinion by Mr. O'Brien as to "the

sufficiency of information Plaintiff provided to substantiate its business interruption claim" and "the

unreasonableness of Defendant's subsequent requests for supplemental information," any such

testimony must be excluded as impermissibly embracing legal issues reserved for determination by

the Court and the jury.

-20-

Mr. O'Brien's "opinion" regarding "Plaintiff's entitlement to additional payments for Plaintiff's business interruption losses" must be excluded because O'Brien admits that he has no such opinion, and no basis on which to form one. At his deposition, in response to a hypothetical posed by the plaintiff's attorney, O'Brien stated without elaboration that the plaintiff's business income loss "would easily exceed $100,000." James O'Brien dep. at 167 (Pg ID 2656). However, that is a rather brazen declaration in light of O'Brien's admission, earlier during the same deposition, that he had no opinion to offer concerning the extent of the plaintiff's business income loss:

> Q.   So would it be fair to say that you don't have any opinions to offer in connection with whether or the extent to which Bowler's Alley, Inc., sustained a business income loss as a result of the May 17th, 2012 water event?
> A.   Correct.

*Id.* at 17 (Pg ID 2619). The plaintiff has not made any disclosure setting forth any factual basis for an opinion as to the extent of the plaintiff's business income loss, or explaining the method by which O'Brien arrived at his conclusion that the plaintiff's losses "would easily exceed $100,000." Moreover, O'Brien admitted at his deposition that he has never done any work to produce such a conclusion, either in this case or in any other context:

> Q.   Have you ever assisted in preparing — I may have asked you this, and if I did I apologize — assisted in preparing a business income claim of any type for an insurance company?
> A.   No.
> Q.   Or conversely, a business income claim for an insured to present to an insurance company?
> A.   No.
> Q.   And you've done no work in this case to substantiate any business income claim that Bowlers' Alley is making —
> A.   No.
> Q.   — is that correct?  Is that correct?
> A.   I haven't done any work specifically for the insurance claim, is that your question?
> Q.   Yes.

-21-

A.      I just do the normal year end that I've done for him for the last 15 years.

*Id.* at 143-44 (Pg ID 2650).

Nevertheless, if the plaintiff can lay a foundation at trial to show that O'Brien has personal knowledge of the plaintiff's business affairs, he will be permitted to testify as to the facts reflecting the plaintiff's financial condition, the substance of accounting reports he prepared and the basis for them, and the economic significance of the transactions recorded in the course of the plaintiff's business. The defendant seeks to exclude O'Brien's testimony in its entirety, but it evidently does not challenge his qualifications as an accountant, as they would apply to his general testimony regarding the plaintiff's accounting records and financial affairs.

The Court will exclude testimony by James O'Brien relating to "the sufficiency of information Plaintiff provided to substantiate its business interruption claim," "the unreasonableness of Defendant's subsequent requests for supplemental information," and "Plaintiff's entitlement to additional payments for Plaintiff's business interruption losses."

### G.  Michael Hale

Michael Hale's report states that he is an insurance broker and an attorney, and that he presently works for a company that has issued an insurance policy to a bowling alley. His report sets forth the following nine expert opinions: (1) "[t]here was direct physical loss to covered property arising out of a covered cause of loss that occurred on or about May 17, 2012 that is covered by the CIC property policy"; (2) "CIC has breached the policy contract by not [paying the full replacement cost of plaintiff's water-damaged lanes] and waived its rights to contest application

-22-

of these provisions by not providing notice of its intentions within 30 days of receiving the proof of loss"; (3) "[t]he interim proof of loss signed by the insured was reasonably prepared based upon information then known to the insured and on the date signed represented an accurate depiction of estimated losses arising out of the covered cause of loss," and "[i]t was unreasonable and a breach of contract for CIC to reject all aspects of the interim proof of loss"; (4) "[t]he failure of CIC to pay replacement cost for wood lanes violates the policy condition that requires it to replace damaged property with comparable materials and quality"; (5) "[t]he CIC property policy covers the loss of income and extra expenses arising out of the covered cause of loss which occurred on May 22, 2012"; (6) "[t]he insured has attempted to mitigate its damages arising out of the covered cause of loss"; (7) "[n]umerous aspects of CIC's handling of this property insurance claim were unreasonable in light of established insurance industry custom and practice and the language of the CIC policy"; (8) "[t]he categories of consequential damages arising out of the breach by CIC in failing to pay this claim were foreseeable, such as, without limitation, further extended business interruption to the insured's business operations"; and (9) "[t]he insured has met or exceeded its obligation of substantial compliance with the policy conditions pursuant to Michigan law."  Def.'s Mot. [dkt. #110], Ex. 1, Report of Michael Hale dated Oct. 9, 2014 at 2-5 (Pg ID 5565-68).

The defendant seeks to preclude Hale's testimony on each of these subjects, because they amount to opinions on legal issues reserved for the Court.  The Court agrees.  Expert testimony "may not 'define legal terms,'" and mere "[r]ecitation of legal principles . . . is not appropriate expert testimony."  *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 592-93 (6th Cir. 2014) (quoting Fed. R. Evid. 704(a); *Berry*, 25 F.3d at 1353.  Expert testimony that "attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury

instructions, hardly can be viewed as being helpful to the jury," and exclusion of such testimony therefore also may be appropriate "on the ground that it would not be helpful to the trier of fact." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (citing Fed. R. Evid. 702).

Hale's "report" is indistinguishable from a cumulative table of contents of the plaintiff's various briefs on the parties' dispositive motions, with assorted argumentative topical sentences mixed in. It is devoid of facts and cites nothing from the record to support the conclusions set forth, except by vague references to materials such as "the amended complaint," "the claim file," and "plaintiff's production of extensive documentation." Hale purports to set forth opinions on matters such as whether a "direct physical loss" occurred at the plaintiff's facility, but it is apparent that he has no personal knowledge of the relevant facts and no education or experience that he could apply to assess any such facts if he did know them. Moreover, each of the "opinions" that Hale offers embraces legal issues central to the disposition of this case, and his conclusions on several of those points are wrong as a matter of law. The jury does not need Mr. Hale's help to decide these dispositive questions, such as whether Cincinnati must pay for synthetic or wood lanes, whether, if it must pay for wood, its refusal to do so was unreasonable, and whether, if its delay was unreasonable, the consequences to the plaintiff were reasonably foreseeable.

The Court will preclude Mr. Hale's testimony.

IV.

For the reasons discussed above, the Court will deny the plaintiff's motion to add Donald Gracey as an expert witness, exclude a portion of the testimony of Robert Walworth, exclude the testimony of Kenneth Deback, Mark Shasko, Randall Bernard, and Michael Hale, and exclude part of the testimony of James O'Brien.

-24-

Accordingly, it is **ORDERED** that the plaintiff's motion to add Donald Gracey as an expert witness [dkt. #60] is **DENIED**.

It is further **ORDERED** that the plaintiff's motion to exclude the testimony of Robert Walworth [dkt. #111] is **GRANTED IN PART AND DENIED IN PART**.  The defendant may not elicit testimony from Mr. Walworth that financial statements submitted by the plaintiff were false or misleading.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the plaintiff's motions to exclude the testimony of Kenneth DeBack, Bryan Tolden, and Mark Shasko [dkt. #112, 113, 115, 114] are **GRANTED**.

It is further **ORDERED** that the defendant's motion to exclude the testimony of Randall Bernard [dkt. #108] is **GRANTED**.  The plaintiff may not elicit testimony from Mr. Bernard concerning the cause of the failure of the lights.

It is further **ORDERED** that the defendant's motion to exclude the testimony of James O'Brien [dkt. #109] is **GRANTED IN PART AND DENIED IN PART**.  The plaintiff may not elicit testimony from Mr. O'Brien relating to the sufficiency of information the plaintiff provided to substantiate its business interruption claim, the unreasonableness of the defendant's subsequent requests for supplemental information, or the plaintiff's entitlement to additional payments for Plaintiff's business interruption losses.

It is further **ORDERED** that the defendant's motion to exclude the testimony of Michael Hale [dkt. #110] is **GRANTED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  May 28, 2015

-25-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 28, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI