UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOWLERS' ALLEY, INC.,

                  Plaintiff,                           Case Number 13-13804

v.                                         Honorable David M. Lawson

THE CINCINNATI INSURANCE
COMPANY,

                  Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The parties in this breach of insurance contract case cannot agree on certain items of loss that were claimed by the plaintiff after its bowling alley was damaged by water that flooded the premises when a water pipe burst, and the amount for each claim. Presently before the Court are motions for summary judgment filed by each party. The defendant contends that it is entitled to judgment as a matter of law on the plaintiff's complaint, and the plaintiff argues that it likewise is entitled to judgment on the remaining count of the defendant's counterclaim. The Court heard oral argument on April 9, 2015 and now concludes that both motions should be granted in part and denied in part. The Court will dismiss the counterclaim, and the claims that remain in the plaintiff's complaint will proceed to trial.

I.

The plaintiff contends that a flood at its bowling alley in May 2012 damaged a number of wooden bowling lane surfaces, and that high levels of humidity and condensation in the days after the flood also caused the failure of many light fixtures in the building. The flooding occurred on or below the floor of the facility; no water was sprayed on the ceiling. The parties agree that

defendant Cincinnati Insurance Company issued a hazard insurance policy that covered the premises. After the plaintiff contacted its insurer, Cincinnati paid out more than $600,000 based on early estimates that called for resurfacing of the damaged alleys with synthetic overlays, but that amount did not include the claimed damage to light fixtures and certain other expenses for debris removal and general contracting.

On April 4, 2013, Cincinnati sent the plaintiff a request for a proof of loss. Bowler's Alley requested and Cincinnati granted an extension of time to complete the proof of loss. On June 18, 2013, the plaintiff submitted a sworn "interim" statement of proof of loss with a $2.6 million price tag, which Cincinnati rejected on July 17, 2013. The rejection letter set forth in detail nine categories of items and amounts included in the proof of loss that Cincinnati claimed were not covered, insufficiently documented, or contradictory to previous statements regarding the extent of the loss and damages. The specific disputed items are discussed in turn in the analysis section below.

On August 16, 2013, the plaintiff responded by letter and demanded that Cincinnati proceed to process its claim immediately. In that letter, the plaintiff addressed each of the items of asserted deficiency in turn, contending that the items were allowable and appropriate, and that it previously had supplied adequate documentation, or soon would provide documentation, to substantiate each item. On August 30, 2013, Cincinnati sent a letter setting forth its continued discontent with the items pointed out in its earlier rejection letter, asserting that the August 16, 2013 letter was nonresponsive to various requests, and stating that certain requested documents still had not been provided. On September 6, 2013, the plaintiff filed its complaint seeking a declaration of rights under the policy and a judgment compelling the defendant to pay its claim in full. The defendant

filed a counterclaim asserting that the plaintiff breached the insurance contract in a number of respects, and also included counts based on fraud and unjust enrichment. In a previous opinion and order, the Court dismissed the latter counts and limited the breach of contract count.

By far, the greatest area of dispute is over the cost of addressing the damage to the wooden bowling lanes. The defendant contends that it can satisfy its obligation under the policy by covering the wooden lanes with synthetic overlays. The plaintiff insists that because it bought replacement cost coverage, the defendant must pay for replacing all the lanes with similar wooden lanes. Cincinnati Insurance replies that the plaintiff is barred from pursuing its claim for the full replacement cost of its damaged wood bowling lanes because it failed to begin or complete repairs of its lanes within the two-year time limit under the policy. The defendant also argues that it is entitled to a judgment as a matter of law on the following specific items in the plaintiff's proof of loss: (a) $141,000 for damage to light fixtures due to condensation; (b) $70,000 for debris removal; (c) $45,000 for rewiring electronic scoreboards; (d) $30,000 for removing and replacing the front main counter; (e) $365,988.52 as a "general contractor fee" payable to the insured; (f) $22,758.51 for business personal property; (g) $13,300 for miscellaneous labor expense; (h) $200,000 for lost business income during 2012 and 2013; (i) $2,760 for "lane inspections"; and (j) $10,000 for "accounting and legal services." And Cincinnati Insurance asserts that it should not have to pay any of the loss items because the plaintiff breached the "Legal Action Against Us" provision of the policy by failing timely to disclose documents and information to substantiate certain specific line items set forth in the interim sworn statement of loss.

For its part, the plaintiff argues that the defendant waived its right to object to the plaintiff's interim sworn proof of loss; it is entitled to judgment as a matter of law dismissing the defendant's

claims for breach of contract premised upon violations of the "fraud or misrepresentation" provision of the policy and its related affirmative defenses; it should be entitled to seek consequential damages resulting from the defendant's allegedly unreasonable refusal to pay or delay in fully paying its claim; and the defendant has waived its right to submit the parties' dispute as to the amount of loss for an appraisal, if it is obligated to cover the plaintiff's loss.

It is undisputed that defendant Cincinnati Insurance Company issued a commercial insurance policy to the plaintiff that was in force when the May 2012 water event occurred at the bowling alley. That policy insured against "loss" to the insured's "building" and "business personal property." It also covered certain related items, such as the expense of "debris removal" and loss of "business income" due to an interruption of the insured's operations resulting from damage to its facilities.

The policy defines the term "covered property" to include "the building or structure described in the Declarations," "fixtures," affixed thereto, and "permanently installed [] machinery and equipment." The term "business personal property" is defined to include "furniture," "machinery and equipment," "stock," and "all other personal property owned by you and used in your business." Section G of the policy defines the term "loss" to "mean[] accidental loss or damage." The parties evidently do not dispute that the plaintiff's bowling lanes and equipment and furniture such as electronic scoreboards and the "front desk counter" were either "fixtures" or "business personal property" as defined under the policy, and that the bursting of the water pipe was an "accident" within the scope of coverage. They disagree, however, on the scope of damage that properly may be attributed to the burst pipe event or recovered by the insured under other terms of the policy.

-4-

As to coverage for lost "business income," the policy states that the insurer will pay for lost income during any period when the insured's operations are halted due to a covered loss:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.

Policy at 16 (Pg ID 608). The policy defines the term "business income" to mean:

> a.  Net Income (net profit or loss before income taxes) that would have been earned or incurred; and
> b.  Continuing normal operating expenses, including payroll.

Policy ¶ G(2) (Pg ID 625).

The policy was issued with coverage limits of $6,300,000 for the plaintiff's "building" and $210,000 for "business personal property." Coverage for items such as "debris removal" was subject to a "blanket coverage" limit of $150,000 per occurrence, and coverage for "business income" was limited to $100,000.

As to the valuation of losses claimed by an insured, the policy provides as follows in Section D(4)(a) ("Loss Payment"):

> In the event of "loss" insured by this Coverage Part, at our option, we will either:
> (1)  Pay the value of lost or damaged property;
> (2)  Pay the cost of repairing or replacing the lost or damaged property;
> (3)  Take all or any part of the property at an agreed or appraised value; or
> (4)  Repair, rebuild or replace the property with other property of like kind and quality.
> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of SECTION D. LOSS CONDITIONS, 7. Valuation or any applicable provision that amends or supercedes this valuation condition.

Policy at 28 (Pg ID 620). Section D(7)(a) states that the insurer "will determine the value of Covered Property in the event of 'loss' as . . . 'Actual Cash Value' as of the time of 'loss,'" subject

-5-

to certain minor exceptions that are not at issue here.  The term "Actual Cash Value" is defined in Section G ("Definitions") to mean "replacement cost less a deduction that reflects depreciation, age, condition and obsolescence."  However, the parties agree that the plaintiff purchased optional coverage so that it could recover the replacement cost of lost items, that is, that actual cost of replacement without deduction for depreciation.   Section F(3) outlines the terms of the "Replacement Cost" coverage:

> c.     You may make a claim for "loss" covered by this insurance on an "Actual Cash Value" basis instead of on a replacement cost basis.  In the event you elect to have [a] "loss" settled on an "Actual Cash Value" basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the "loss".
>
> d.     We will not pay on a replacement cost basis for any "loss":
> > (1)    Until the lost or damaged property is actually repaired or replaced with other property of generally the same construction and used for the same purpose as the lost or damaged property; and
> > (2)    Unless the repairs or replacement have been completed or [are] at least underway within 2 years following the date of "loss".
>
> e.     We will not pay more for "loss" on a replacement cost basis than the least of:
> > (1)    The Limit of Insurance applicable to the lost or damaged property;
> > (2)    The cost to replace, on the same "premises", the lost or damaged property with other property:
> > > (a)    Of comparable material and quality; and
> > > (b)    Used for the same purpose; or
> > (3)    The amount you actually spend that is necessary to repair or replace the lost or damaged property.

*Id.* at 33.

The policy states under Section D ("Loss Conditions") that in the event of loss or damage, the insured must:

> (5)    At our request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values and amount of "loss" claimed.
>
> (6)    As often as may be reasonably required, permit us to inspect the property proving the "loss" and examine your books and records.  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis and permit us to make copies from your books and records.

-6-

     (7)     Submit a signed sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request. We will supply you with the necessary forms.

     (8)     Cooperate with us in the investigation or settlement of the claim.

*Id.* at 27.  The policy also states that the insurer "may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required about any matter relating to this insurance or the claim, including an insured's books and records."  *Id.* at 28.

The "Commercial Property Conditions" supplement to the policy states that "[n]o one may bring a legal action against [the insurer]" unless  "[t]here has been full compliance with all terms of [Section D]," and "[t]he action is brought within 2 years after the date on which the direct 'physical' loss occurred."  *Id.* at 65.  The commercial property supplement further states that

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

     1.     This Coverage Part;
     2.     The Covered Property;
     3.     Your interest in the Covered Property; or
     4.     A claim under this Coverage Part.

*Ibid.*

The plaintiff, a Michigan corporation, filed this lawsuit against Cincinnati Insurance Company, an Ohio-based company, based on diversity of citizenship.  In a diversity case, state contract law provides the rules for decision.  *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998).

Under Michigan law, when construing a contract or one of its provisions, the intentions of the parties govern.  *First Nat. Bank of Ypsilanti v. Redford Chevrolet Co.*, 270 Mich. 116, 121, 258 N.W. 221, 223 (1935).  The first objective is to "honor the intent of the parties," *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994), and the prime source of that intent

-7-

is the plain language of the agreement, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language.").   Therefore, the Court will look to the terms of the insurance contract to determine the rights and obligations of the parties.   "'Where the language of the writing is not ambiguous the construction is a question of law for the court on a consideration of the entire instrument.'"   *In re Landwehr's Estate*, 286 Mich. 698, 702, 282 N.W. 873, 874 (1938) (quoting *Griffin Mfg. Co. v. Mitshkun*, 233 Mich. 640, 642, 207 N.W. 814, 814 (1926)).

## II.

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute.   *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate.").   Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."   *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

-8-

A.  Waiver

As an initial matter, the plaintiff contends that Cincinnati waived its right to object to anything in the plaintiff's interim sworn proof of loss by failing to comply with Michigan Compiled Laws § 500.2006, which requires the insurer to "specify in writing the materials that constitute a satisfactory proof of loss not later than 30 days after receipt of a claim unless the claim is settled within the 30 days."  Mich. Comp. Laws § 500.2006(3).  Citing *Medley v. Canady*, 126 Mich. App. 739, 745, 337 N.W.2d 909, 911-12 (1983), the plaintiff argues that the "failure to specify in writing the materials which constitute satisfactory proof of loss excuses the requirement of said proof of loss in M.C.L. § 500.2006(4)," and moots any objection to the proof of loss by the insurer.

There is no merit to this argument.  The time allowed for specifying what materials would constitute an adequate proof of loss runs from the time that a proof of loss is submitted, as suggested by *Angott v. Chubb Grp. Ins.*, 270 Mich. App. 465, 486, 717 N.W.2d 341, 354 (2006).  In that case, the court discussed an insurer's "proper[] reject[ion of] the proof of loss" by citing section 500.2006(3), suggesting that the receipt of the proof of loss triggers the obligation to "specify in writing the materials that constitute a satisfactory proof of loss."  *Ibid.*  It is undisputed that Cincinnati rejected the plaintiff's interim sworn proof of loss less than thirty days after it was submitted by sending the plaintiff a detailed letter setting forth its objections to specific items, and directing its insured to submit specific types and instances of documents or evidence to support its claim.  Am. Compl., Ex. 4, Letter dated July 17, 2013.

Moreover, the application of waiver or estoppel is not appropriate where an insurer has expressly reserved its right to present additional defenses in a written denial.  *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 521 (6th Cir. 2002) ("[I]n its September 16, 1994

letter, Hartford expressly indicated that it 'reserved all rights and defenses available to it under the bond and applicable law' with regard to Claim II. The Court agrees with the district court that this waiver argument is meritless.").  Nothing in the rejection letter, or the insurer's subsequent conduct or communications, can be construed as an affirmative relinquishment of its right under the policy to require an adequately supported and documented sworn proof of loss before paying the plaintiff's claim.  The defendant therefore is entitled to judgment as a matter of law on this issue.

### B.  Replacing Wood Lanes

Bowlers' Alley contends that Cincinnati is obligated to pay the full $1,116,609.60 cost quoted by vendor Capital Bowling Service to replace all 48 wooden lanes in its facility with new wood lanes.  Cincinnati responds that it is not obligated to pay for any repairs at all to lanes 26 through 48, because none of the experts or contractors that inspected the facility ever determined that any water incursion reached or in any way affected lanes other than 1 through 25.  Cincinnati asserts that lanes 41 through 48 were covered over and the area was being used for mini-golf before the May 2012 event, and those lanes therefore would not need to be repaired even if they were damaged.  To the extent that any lanes were damaged, Cincinnati insists that nothing in the record suggests that any lanes beyond 1 through 25 were affected by water.

The plaintiff points out that the demonstrated need for replacement of at least lanes 1 through 40 is established by the fact that two vendors recommended repair and replacement of the surfaces on all of those lanes, and Cincinnati already has paid the claim up to the amount of the actual cash value of those repair estimates — for forty lanes, not twenty-five.  But Cincinnati insists that the proposal to resurface all of lanes 1 through 40 was premised solely on leaving all lanes in use with a uniform appearance. The plaintiff replies that Cincinnati's arguments entirely disregard the

-10-

optional "replacement cost" coverage provisions of the policy, under which the insurer is obligated to pay the full cost "to replace . . . the lost or damaged property with other property . . . [o]f comparable material and quality."

Cincinnati responds that it is not obligated to "[r]epair, rebuild or replace the property with other property of like kind and quality," Policy ¶ D(4)(a)(4), because it elected instead simply to "[p]ay the cost of repairing or replacing the lost or damaged property" under paragraph D(4)(a)(2), which does not specify that the cost of repairs paid for (as opposed to actually performed) by the insurer must be increased to allow for "like kind or quality" materials. Cincinnati argues that it is undisputed that it already has paid the depreciated cost of the repair estimates initially submitted by the plaintiff, which came to $433,081.96. That amount was based on estimates from Capital Bowling and Brunswick, both of which recommended removing out-of-tolerance parts of lanes 1-25, followed by leveling, sanding, and attaching new synthetic overlays to all of lanes 1 through 40, to ensure that all lanes in use would meet industry specifications and have a uniform appearance.

The plaintiff maintains that synthetic lane overlays are not "of comparable material and quality," because they have a significantly different aesthetic appearance and "feel" for bowlers, and the useful life of wood lanes is up to 75 years, as opposed to only 25 for synthetic overlay lanes. The plaintiff points out, moreover, that the $6 million coverage limit for the "building" under the policy would be illusory and nonsensical unless the policy was issued on the premise of insuring against the need to replace wood lanes like-for-like with wood lanes, which is substantiated by a replacement cost estimate that the insurer prepared in the course of underwriting the policy showing a replacement cost of more than $4 million for "miscellaneous" components of the facility, including the wood lanes and associated machinery and systems. This estimated cost projected by the insurer

-11-

at the time of underwriting is more than ten times the proposed replacement cost using synthetic overlays. The plaintiff contends that this large gap cannot reasonably be accounted for by any of the other components of the facility such as machinery or scoring systems, or even all of them taken together, and that the divergence plainly suggests that the parties contemplated coverage that would provide for replacement of wood lanes with wood lanes.

Finally, Cincinnati asserts that the actual cash value payment was accepted by the plaintiff without objection, and that Bowlers' Alley only obtained a quote for wood lane replacements and insisted on full replacement of all its lanes with new wood lanes after a "musty odor" in the facility led to the discovery of mold on parts of the wood foundation supporting the lanes. Cincinnati asserts that, to the extent that the plaintiff claims the lanes must be removed in order to remediate the mold (destroying them in the process), its liability for property damage due to mold is limited to no more than $15,000 under Paragraph A(5)(g)(3) of the Policy.

These arguments require the Court to interpret the parties' contract. If the contract language is "clear and unambiguous," the Court need look no further. *Haywood v. Fowler*, 190 Mich. App. 253, 258, 475 N.W.2d 458, 461 (1991). A contract is unambiguous if it "fairly admits of but one interpretation." *Allstate Ins. Co. v. Goldwater*, 163 Mich. App. 646, 648-49, 415 N.W.2d 2, 4 (1987). When the contract language is clear, the Court will discern the parties' intent according to the contract's "plain sense and meaning." *Haywood*, 190 Mich. App. at 258, 475 N.W.2d at 461; *see also Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App. 163, 166, 550 N.W.2d 846, 848 (1996). The Court must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.* 468 Mich. 459, 468, 663 N.W.2d 447, 453 (2003).

-12-

If "the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact," *Port Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 323, 550 N.W.2d 228, 237 (1996), and where the terms of a contract are ambiguous, the Court must look to extrinsic facts along with the terms of the agreement to determine the parties' intentions, *Klapp*, 468 Mich. at 663 N.W.2d at 454. However, disagreement among the parties as to the meaning of a contract term does not necessarily create ambiguity as a matter of law. *Steinmetz Elec. Contractors Ass'n v. Local Union No. 58 Int'l Bhd. of Elec. Workers, AFL-CIO*, 517 F. Supp. 428, 432 (E.D. Mich. 1981).

It is undisputed that the insurance policy covered the plaintiff's "building" and its component parts or fixtures, including the wood bowling lanes. The parties evidently do not dispute that the burst water pipe and resulting water incursion into various parts of the building caused "accidental loss or damage" within the scope of coverage of the policy. The defendant contends that there is no evidence that any lanes other than 1 through 25 were affected by water that entered the substructure supporting the lanes, but the available evidence is unclear on the number of lanes affected.

Brian Estes of Capital Bowling Service inspected the facility in June 2012 and found significant warping of the lane surfaces on lanes 1 through 25, as measured by the means he uses to ensure that lanes are within industry specifications. Estes found deviations in the "approach" sections of various lanes between 1 and 25 that far exceeded the tolerance of 0.040 inches out-of-level generally accepted for lanes used for public bowling or league play. Estes noted that the buckling of individual wood slats in the "approach" sections of the lanes was easily visible to the naked eye, and he described the wood surface as "raised way beyond normal tolerances, more than

-13-

1/4 inch on lanes 1-23." Estes observed visual indications of water seepage under the lanes, including on the wood substructure under the lanes, in areas that had been opened by the contractor hired to evacuate water and dry the facility. Estes opined that the "lane reading[s] are a definite sign that water has penetrated the sleeper[s] on the floor, and the shim material used to level the 2x10 off the sleeper." Estes concluded that "[w]ater has raised [the wood supports] so that the [affected lanes are] no longer in a usable state for league or open bowling use." However, he also noted that his checks of lanes 30 and 35 showed that those lanes were within tolerances. Estes noted that "[a] complete lane sanding might bring lanes 1-25 back into compliance, but would take 25 years of life off those lanes, thus rendering them unusable in the future." Estes also observed that the useful life of wooden lanes would be 50-75 years, compared with 20-25 years for synthetic overlay lanes, but recommended that resurfacing of all the lanes 1-40 with synthetic material was the most cost-effective way to get the plaintiff back in business, since synthetic lane surfaces tend to run around one-third the cost of wooden lanes, which must be custom built in place.

Milan Vranisevich of Brunswick Bowling also inspected the plaintiff's lanes and prepared a report on the damage he observed, along with a repair proposal. Vranisevich measured deviations in the surfaces of eight different lanes from 1 through 31, with lane 31 having sections out of level by 0.100 and 0.045 inches at 4 feet and 11 feet from the foul line, respectively (as noted above, those values are beyond the benchmark value of 0.040 inches required for the lanes to meet bowling industry standards). Like Estes, Vranisevich recommended removing severely buckled wood sections and leveling the remaining parts of lanes 1 through 40, then covering all of those lanes with synthetic overlay material, as the most practical and cost effective means of putting the lanes back in operation. Vranisevich observed, based on his "20 years of lane experience," that in his "expert

-14-

opinion," the integrity and conformity of plaintiff's lanes had been compromised by "water, moisture, humidity, heat, expansion and contraction of the material." Vranisevich opined that removing the lanes in order to attempt to repair the foundations would require "cut[ting] the surface of the wood lane[s]," which would "severely compromise [their] integrity." He therefore recommended installing new overlays as the only practical means of repair.

Based on the expert investigations by Estes and Vranisevich, a jury reasonably could conclude that the plaintiff's wooden bowling lanes were damaged and rendered unsuitable for use due to the water incursion into the sub-lane wooden foundations. It appears undisputed that the water event was an "accident" as contemplated under the policy and the lanes were within the scope of "covered property." The physical swelling and displacement of the lanes due to water reaching the sub-floor supports represents a "direct physical loss" under the plain and ordinary meaning of that phrase, which meets the definition of a "covered cause of loss" under the policy. *See* Policy ¶ A(3)(a) (Pg ID 597). The parties agree that the policy was issued with optional "replacement cost coverage" for all elements of the plaintiff's "building," including the wooden lanes. Under the plain terms of the policy, the insurer therefore is obligated to pay the full cost "to replace . . . the lost or damaged property with other property . . . [o]f comparable material and quality," provided that the insured meets certain conditions precedent to payment under the replacement cost provisions. The evidence, taken in the light most favorable to the plaintiff, is not crystal clear as to the exact number of lanes that were affected by the water event. The report by Estes suggests that lanes 30 and 35 passed his spot check, but Vranisevich observed out-of-specification measurements in some parts of lane 31.

The defendant did not challenge — and made an actual cash value payment based upon — two separate estimates that called for installing synthetic overlays on all of lanes 1 through 40. However, those proposals apparently were motivated by the obvious concern of ensuring a uniform appearance and functionality across all lanes, and it is unsurprising that the insurer would have been willing to pay for a synthetic alternative applied to 40 lanes at one-third the cost of full wood replacements, considering that the cheaper synthetic coverage of forty lanes would be approximately half the cost of wood replacements for just 25 lanes. The insurer's assent to a less costly repair that would apply to undamaged lanes does not establish that more lanes then 1 through 25 or 1 through 31 actually were damaged. The plaintiff, for its part, contends that the full extent of the actual damage cannot be assessed until the wooden lanes are removed, and that the lanes therefore must be destroyed in the process of determining whether they are damaged. However, the plaintiff has not pointed to any expert observations or measured deviations or displacement in any lanes beyond lane 31 that would indicate that more lanes actually were affected than the 1 through 25 or 1 through 31 that Estes and Vranisevich referred to in their reports as being out of specifications.

Because the expert testimony is varied as to the extent of damage, a genuine issue of fact remains on the question of exactly how many lanes must be repaired. However, under the plain terms of the policy the insurer only is obligated to pay for lanes compromised by a "direct physical loss," and there is no evidence in the record that more than 31 lanes were physically affected by the water incursion. Neither party, therefore, is entitled to judgment as a matter of law as to how many lanes the insurer is obligated to repair.

Nevertheless, under the plain terms of the policy, it is clear that the insurer must pay the full replacement cost of all lanes that are shown to have been physically affected by the water event, and

-16-

that it must pay for replacements of "comparable material and quality."  Neither party suggests an applicable definition of the word "comparable," and the term is not defined in Section G of the Policy ("Definitions").  Cincinnati has not filed any motion challenging either of the experts that conducted the lane investigations and submitted proposals for replacements, and it apparently does not dispute Mr. Estes' proffered opinion that wood lanes have a useful life as much as three times longer than that of synthetic overlay lanes.  That suffices to suggest that synthetic lanes may not be "comparable" to wood in all respects, although but the parties do not dispute, as Estes observed, that synthetic lanes are widely used in the industry.

By its plain meaning, comparable does not mean "identical," but may apply to things "permitting or inviting comparison often in one or two salient points only."  Merriam-Webster's Unabridged Dictionary (2015).  Wood and synthetic overlays may have "enough like characteristics or qualities to make comparison appropriate," *ibid.*, in that both can be and are used for the same purposes.  However, synthetic lanes also differ substantially from wood in their aesthetic appearance and useful life — they cost one-third as much, but also last only one-third as long.  *See Casetech Specialties, Inc. v. Selective Ins. Co.*, No. 13-11792, 2013 WL 6835098, at *7 (E.D. Mich. Dec. 23, 2013) (holding that a replacement cost provision requiring replacements of "comparable material and quality" required the insurer to pay the full "cost to replace old, damaged property with new property of comparable material and quality that is used for the same purpose (e .g., a Chevy for a Chevy, not a Cadillac for a Chevy, or a jet for a Chevy)").

The valuation of the replacement cost of the plaintiff's wooden lanes by the insurer itself, particularly given the substantial cost difference between wooden and synthetic replacements, certainly suggests that the parties contemplated something more than mere functional equivalence

when they negotiated a replacement cost coverage policy that assessed the value of the plaintiff's "miscellaneous" fixtures at more than $4 million.  In the absence of an express definition of the term or any plain provision explicitly guaranteeing a "wood for wood" replacement of damaged lanes, whether synthetic lanes are of "comparable material and quality" to wood remains a question for resolution by the jury, based on the available evidence as to the qualities of each.

Neither party, therefore, is entitled to judgment as a matter of law on these questions: (1) how many lanes must be "replaced" and (2) whether synthetic overlay lanes would qualify under the policy as being of "comparable material and quality."  Cincinnati must pay to replace lanes that suffered physical damage due to water incursion — however many that may be — and it must cover the full cost of "comparable" replacements for all of those lanes, whatever that may mean.  Both determinations will be up to the jury.

### C.  Insured's Duty to Begin or Complete Repairs

Cincinnati contends that, to the extent that Bowler's Alley seeks additional payments under the optional "replacement cost" coverage provisions of the policy, it is precluded from recovery because it has failed to make or undertake any repairs at all, which is a precondition to the payment of replacement cost benefits under Paragraph F(3)(d).

The Michigan Supreme Court has recognized as a practical matter that a plaintiff property owner "could not be expected to repair, rebuild, or replace [their damaged property] while [] litigation [on its coverage dispute] was pending," because, among other reasons, "a bank would be chary to lend money [to finance repairs] on the basis of an unlitigated law suit in which the defendant and its vast resources intend to present several defenses to payment." *Smith v. Michigan Basic Prop. Ins. Ass'n*, 441 Mich. 181, 190-91, 490 N.W.2d 864, 867-68 (1992).  As the court

-18-

explained, a policy clause conditioning the payment of replacement cost benefits on the completion of repairs is not an obstacle to entry of judgment in favor of the plaintiffs who, for obvious economic reasons, had not yet commenced repairs when they filed suit over the coverage dispute.

For obvious economic reasons, the plaintiff could not reasonable undertake to begin or complete more than $1.1 million in contemplated repairs to its facility given Cincinnati's refusal to authorize payment for the full cost of replacing its wood lanes with new lanes of "comparable materials and quality." If the plaintiff prevails and secures a ruling compelling Cincinnati to honor its demand for replacement of wood lanes with new wood lanes, then the repair deadline clause of the policy will not preclude it from proceeding within a reasonable time allowed by the Court after entry of judgment to commence and complete repairs, and then make its demand under the policy for full payment of the replacement cost benefits. *Ibid.* The plaintiff is entitled to judgment as a matter of law precluding Cincinnati from pursuing this defense.

### D.  Light Fixtures

Cincinnati contends that there is no admissible evidence that the failure of numerous overhead light fixtures in the plaintiff's building was caused by the water event. It offers the opinion of its expert, Kenneth DeBack, who offered an alternate failure theory. But the Court has excluded DeBack's testimony. Nonetheless, it is the plaintiff's burden to prove that the damage to the light fixtures was caused by an event for which there was coverage under the policy.

The plaintiff points out testimony by its employee Douglas Kruse indicating that the lighting failures happened soon after the water event, and it appears undisputed that the lights worked before the event. Kruse testified that, within a week after the flood, when he turned on the lights, he saw "crackling and sparks flying . . . like fireworks coming from the ceiling," and then he observed the

-19-

lights over lanes 3 through 6 go out and not come back on.  Subsequently, Kruse observed that all of the lights over lanes 1 through 40 either sparked when turned on or would not turn on at all.

That testimony, however, is not sufficient to create a fact question on whether the failure of the light fixtures was a "direct physical loss" caused by the water event.  *See Skinner v. Square D Co.*, 445 Mich. 153, 172-74, 516 N.W.2d 475, 484 (1994), *overruled in part on other grounds by Smith v. Globe Life Ins Co.*, 460 Mich. 446, 455 n.2, 597 N.W.2d 28, 33 n.2 (1999) (holding that "Michigan law does not permit us to infer causation simply because a tragedy occurred in the vicinity of a defective product.  The plaintiffs were required to set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect" (footnotes, citations, and quotations omitted)); *see also Craig ex rel. Craig v. Oakwood Hosp.*, 471 Mich. 67, 91-93, 684 N.W.2d 296, 312 (2004) (observing that "[i]t is axiomatic in logic and in science that correlation is not causation").  Nor does any of the plaintiff's other evidence help it.  Randall Bernard flatly admitted that he has "no idea" what caused the failure and did nothing to try to determine the cause. He was not even asked to give an opinion about why the lights failed, but simply prepared an estimate for replacing them, after he was told by Mr. Kruse that the lights failed due to water damage.  Kruse's testimony establishes, at most, that the lights stopped working at some point.  The plaintiff has not offered Kruse as an expert, and Kruse did not offer any opinion about what caused the lights to fail.  Kruse's testimony certainly is admissible to establish that the lights did fail.  But it is not sufficient to show why the lights failed.  In the absence of any admissible evidence to show that the light failures directly were caused by damage due to a covered risk, the defendant is entitled to judgment as a matter of law that it is not liable for the claimed expense of replacing the light fixtures.

-20-

E.  Debris Removal

Cincinnati argues that the claim for $70,000 for "debris removal" is not recoverable because the plaintiff admits that it never incurred any such expense, and because the plaintiff did not notify the defendant in writing of the expense within 180 days of the loss event, as required under Paragraph A(4)(b) of the policy.  The plaintiff concedes that no such expense was incurred, but it contends that is because the defendant never authorized payment for the major part of the work on the lanes to begin — i.e., the installation of new wood lanes.  The plaintiff contends that it submitted multiple written proposals to the insurer that quoted the need for or amounts devoted to debris removal, including an estimate from its contractor ServPro dated May 30, 2012, that included a line item in the amount of $668.45 for removal of "7-8 tons of debris," and a December 14, 2012 email from Brian Estes (forwarded by plaintiff to the insurer's adjuster), that included an estimate of $80,000 for removal of old wood lanes upon replacement.  The plaintiff argues, moreover, that there is no requirement in the policy that debris removal be accomplished within 180 days, and the defendant's attempt to evade liability for this covered expense is disingenuous given that the delay of the work is its own doing.

The policy requires the insurer to pay the lesser of "[t]he cost to replace . . . the lost or damaged property with other property," or "[t]he amount you actually spend that is necessary to repair or replace the lost or damaged property."  The plaintiff has not established that the claimed cost of $70,000 for "debris removal" — which it claims in addition to the $1.1 million quoted price for replacing the lanes as quoted by Capital Bowling — qualifies for coverage under either provision.  *First*, plaintiff concedes that it never incurred such an expense or paid anyone for "debris removal" services, other than as nominally involved in ServPro's initial cleanup of water from the

facility (a service that cost less than $1,000). *Second*, the July 2012 proposal that the plaintiff cites, which included a line item for "removal of scoring systems," specified only $3,000 for that service — which apparently never was performed. *Third*, to the extent that the claim is for removal of old wood lanes or the substructure supporting them, the Capital Bowling Service quote that the plaintiff relies upon stated that "Capital Bowling Service will contract removal & disposal of existing Wood lanes [and] we will supervise contracted workers to minimize[] any damage to existing foundation." Recovery of any amount for removal or disposal of debris generated by the lane replacement process itself therefore would be duplicative of amounts already subsumed in the Capital Bowling Service quoted price. The plaintiff has not offered any record evidence to show that it ever paid any part of the purported $70,000 charge for debris removal, or to show that the amount claimed likely would be recoverable under the policy if its plan for the lane replacement is accepted, and the defendant therefore is entitled to judgment as a matter of law regarding this item.

### F. Rewiring Scoreboard

As to the claim for $45,000 for "rewiring scoreboards," the defendant's entire argument reads: "Plaintiff has failed to account for wiring included within the scoring system/electronics replacement quotation — already paid by CIC." Not to be outdone for brevity, the plaintiff responds that this one-sentence argument — devoid of any supporting citations — "hardly entitles [the defendant] to summary judgment," although it concedes that "Defendant certainly will be entitled to a credit in the event it establishes at trial that a portion of [this item] has already been paid."

Cincinnati does not challenge the item as beyond the scope of coverage or unnecessary to accomplish the needed repairs to the plaintiff's facility. It appears undisputed that the scoring systems are needed to operate the lanes, and it seems that they, or parts of them, had to be moved

or removed to allow evacuation of water and inspection of the damage to the lanes. They obviously will have to be reinstalled at some point when the job of fixing the lanes is done. Cincinnati evidently suspects that it may have paid for some portion of the contemplated expense already, but it has not identified any record evidence to suggest how much, or to whom. The plaintiff, for its part, seems equally unclear about whether some part of this item may have been paid, and submits that the parties should be left to their proofs at trial. So they will.

### G.  Front Main Counter

The defendant challenges a claimed $30,000 expense for removal and replacement of the front main counter of the facility. Cincinnati argues that (1) the plaintiff never submitted a proposal for the work until after the plaintiff filed its complaint; and (2) the counter was "dried by ServPro and did not require replacement." The defendant refers generally to Exhibit 7 of its motion, which is a sixteen page estimate for work evidently performed by ServPro across all major rooms of the main floor in the plaintiff's facility. The Court's review of that exhibit, which is of poor quality, reveals no reference to a "front desk" or "counter" in it, or any report of the condition or need for removal and replacement of such a structure. The plaintiff responds only that it submitted the line item for anticipated repairs in its sworn proof of loss, and later submitted the proposal for the work.

Neither party has established that it is entitled to judgment as a matter of law as to this item. If the plaintiff can show that the expense to remove and replace the counter is one that it paid, or must pay, that is necessary to restoring its facility to operation, then it will be entitled to coverage to the extent that it can substantiate the amount paid, or to be paid. If the defendant can establish that the counter was not damaged and never was or needed to be repaired, then it will not have to pay. The plaintiff asserts that it supplied an estimate for the work to be done, and the defendant

-23-

appears to concede that it received a copy of that estimate after the litigation commenced, but neither party has cited anything in the record suggesting the condition of the counter or any work performed on it.

### H.  General Contractor Fee

The plaintiff included in its proof of loss a "20% General contractor fee to be paid to Insured for his efforts."  Cincinnati argues that this amount, which presumably was meant to be paid to the plaintiff's principal owner, Patrick Langan, is wholly unsubstantiated, and Langan has offered nothing to show how he arrived at the figure, or how it would be necessary to the enterprise of restoring the plaintiff's bowling facilities to operating condition.

The plaintiff responds that "the need for a general contractor to perform and oversee the remediation work is self-evident in light of the multitude of trades involved and the complexities of the project due to the specialized nature of the property[,] the 20% fee claimed by Plaintiff is both reasonable and customary," Langan is qualified because of his experience in the bowling industry, and Cincinnati previously "approved proposals with identical mark-ups from ServPro."

The defendant is entitled to judgment as a matter of law as to this item, because the plaintiff has failed to offer any evidence to show that the purported 20% general contractor fee either was actually paid or would be necessary to the restoration of its facilities.  When questioned on this figure at his deposition, Langan admitted that he had no basis for the figure at all, could not recall what cost basis the 20% amount was calculated from, and simply chose it because it was the figure applied by the water removal contractor in preparing its quote.  He testified:

> Q.    And what is the basis for your claim that you're entitled to $365,988.52 for a general contractor's fee?
> A.    Because that's what it would cost for a general contractor to put all of it back together.

Q.    What do you mean by that?

A.    I mean a general contractor has to put this all back together.

Q.    So is the $365,000 meant to be the cost of repairs?

A.    No, it's the cost of overhead and to make sure that each one of the contractors and everything is taken care of and covered.

Q.    On what basis did you select 20 percent, in other words, why 20 percent?

A.    Because I believe that's what the general contracting rate is. It's also what Servpro had charged to do the water extraction which was paid to Servpro.

Q.    Do you believe then that it was appropriate for you to charge in your proof of loss a 20 percent general contractor fee based upon estimates prepared by contractors that themselves included profit and overhead?

A.    Yes.

Q.    And what is the basis for your understanding that you're entitled to such a fee?

A.    Someone is going to get paid to oversee the replacement and the re-outfitting of each and every job and I'm more qualified than anybody to put all this back together in this bowling center.

Q.    But you've never done a job of this size, have you?

A.    No.

Q.    And you're not a general contractor, are you, sir?

A.    I didn't know that there was a requirement to be a general contractor.

Q.    And the $365,000 was 20 percent of what cost?

A.    I'd have to check.

Q.    Do you know?

A.    No, not without breaking it back down.

Patrick Langan dep. at 235-36 (Page ID No. 2379). Langan concedes that he is not a general contractor and has never performed such work, and he offers no explanation for why a further overhead charge would be necessary to the accomplishment of work by contractors such as Capital Bowling that, as he concedes, already included overhead charges in their own estimates, particularly where those estimates explicitly contemplate that the bidding contractor would arrange for and oversee all necessary work, including, for example, removal and disposal of old lanes before the construction of new ones.

I.  Business Personal Property and Cash Expenses

The plaintiff attached a list of business personal property that allegedly was lost due to the water event, and a list of certain miscellaneous expenses, for which it claims $36,088.51.  The defendant argues that those expenses are unsubstantiated and were not demonstrably caused by any covered "direct physical loss," because Langan admited that (1) none of the spoiled liquor and beer was damaged by water, and it simply was thrown out because it "went bad" after being unused for too long; (2) he only assumed that certain "dry rotted" machine belts were damaged by water, and he could not point to any report or other evidence stating that the belts actually were damaged in any way; and (3) as to the $13,300 demanded under "Labor hours to May 1, 2013," purportedly paid to several individuals for disconnecting ceiling mounted equipment and other odd jobs, Langan asserts that he paid for all the work in cash and has no receipts or invoices to substantiate those payments.

The plaintiff responds that the liquor and beer became a "direct physical loss" when it "went bad" during the extended shutdown of the bowling alley after the water event, it is self-evident that the machine belts were "exposed to moisture" due to the event, and Cincinnati has not pointed to any provision of the policy that bars recovery for necessary expenses paid in cash or that were paid by the insured without an accompanying invoice or receipt.

The defendant has the better argument, at least as to the first two items.  Langan admitted that none of the liquor and beer that "went bad" was damaged by water.  Langan dep. at 237 (Page ID 2380).  Although the policy covers business personal property such as "stock" and any other items used in the course of business, it only covers only against "direct physical loss" due to an insured risk, and the property here was not damaged by the water event.  The claim for loss of beer

and liquor is, essentially, a portion of consequential damages due to the defendant's recalcitrance (discussed below), rather than a direct claim for loss due a covered risk.

Langan admited that he has no personal knowledge that the "dry-rotted" machine belts were affected by the water, and none of the quotes he received stated that the belts were damaged or gave estimates for their replacement. Because the plaintiff has offered nothing to show that the belts actually were affected by water or damaged by the event, the defendant is entitled to judgment as a matter of law as to that item.

As to the odd jobs performed by various individuals, paid for by Langan in cash, the plaintiff has offered nothing other than Langan's own testimony, to establish that the expenses were paid at all, or the amounts of and reasons for those payments. The defendant disputes whether the work ever was done and asserts that the plaintiff's demand for payment is not credible given the absence of any documentation. But it also has not pointed to any provision of the policy that requires written documentation for expenses claimed (other than in the form of a sworn proof of loss, which it is undisputed that the plaintiff provided). The jury may or may not find Langan's accounting practices particularly suggestive of his credibility. But the defendant does not contend that the expenses would not be covered if they were incurred, and if they were necessary to evacuate water or repair the facility. The plaintiff is entitled to submit its proofs to the jury, such as they are, and they may decide whether the expenses are credible and covered.

### J.  Lost Business Income

The plaintiff included in its proof of loss a claim for $200,000 in lost business income, which it construes as "the policy limit [$100,000] times two [for two years of losses]." Cincinnati contends that those claimed amounts are entirely unsupported because Langan admits that he never made any

business income calculations, he never asked his accountant or anyone else to perform such a calculation, and he has no opinion as to the amount, if any, of business income loss suffered. The plaintiff's accountant James O'Brien also admitted that he never performed any business loss analysis or calculation for the plaintiff. James O'Brien dep. at 16-17 (Pg ID 2618-19).

The plaintiff contends in response that Langan never needed to make such a calculation because the defendant's adjuster calculated the loss for him. Langan dep. at 82-84 (Page ID 2341). The plaintiff asserts that its business income losses were abundantly supported by three years worth of financial records that it surrendered for inspection by the insurer on demand, including: signed corporate tax returns; detailed general ledgers, trial balances, and journal entries with explanations; bank statements, check registers and bank reconciliations; paid bills, including copies of invoices with check numbers and date paid information stamped on the invoices; and payroll journals and forms including 1099's. The plaintiff does not, however, identify any specific examples of such documents in the record that it contends either directly or indirectly show or suggest the amount of business income loss that it suffered. Instead, the plaintiff essentially contends that Cincinnati cannot prevail in denying the claim for business income loss, because it has not suggested what it thinks the amount of lost income should have been, and it has not identified with any particularity those documents among all the records submitted by the plaintiff that do *not* support the claim for a loss equal to the policy limit stated in the proof of loss.

The plaintiff further argues that Cincinnati's adjuster Scott Whaley "admitted" that the plaintiff's business income loss exceeded the policy limit of $100,000. But in his deposition as cited by the plaintiff, Whaley merely testified that he recommended early on in the adjustment process that a "reserve" of the policy limits for income loss be set aside, because the repairs likely would

take up to seven months, and he would revisit the claim for income loss once financial data was received.  Scott Whaley dep. at 169-72 (Pg ID 4320-23).  Whaley further testified that "there's no way in heck I would ever recommend a hundred thousand dollar payment without any documentation whatsoever," and "at that point I had zero documentation."  *Id.* at 172 (Pg ID 4323).  The plaintiff does not cite any other testimony or documents attributed to Whaley to show that he determined that the plaintiff was due any specific amount of lost income.

Finally, the plaintiff relies on its accountant James O'Brien's conclusory deposition testimony that the plaintiff's business income loss "would easily exceed $100,000."  But, as noted in a previous order, O'Brien admitted earlier during the same deposition that he had no opinion to offer concerning the extent of the plaintiff's business income loss.

The defendant is entitled to judgment as a matter of law as to the claimed business income loss, because the plaintiff has failed to carry its burden of pointing out specific evidence in the record to quantify — or even suggest — the amount of lost income, if any, that it suffered as a result of the water incursion.  Under the summary judgment protocol ordained by Rule 56, once the challenging party identifies an alleged defect in the opposite party's proofs, "the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  The plaintiff has not fulfilled that obligation.  Instead, the plaintiff simply stated a naked claim for the policy limit, based upon nothing more than its accountant's admittedly wholly uninformed and unsubstantiated assertion that the loss must be more than that amount.  Plaintiff's accountant, however, admits that he never performed any analysis

-29-

or calculation to determine the amount of plaintiff's lost income, and he never was asked to. And plaintiff's principal, Patrick Langan, likewise admits that he never performed any calculations of his own.

The plaintiff asserts that it disclosed numerous financial records to the defendant, and essentially contends that because the insurer has not analyzed those records and proven that the plaintiff's loss was less than the policy limits, then it is obligated to pay the full amount demanded. However, in the absence of any actual testimony or evidence from the plaintiff to show what amount of loss it suffered, the only evidence in the record is the report of the defendant's expert who opined, based on a review of all the financial records and statements provided by Bowler's Alley and its accountant, that "the Plaintiff operated at a significant net operating loss from September 2011 through May 2012, the business was declining significantly, and [it] would have continued to operate at a significant net loss throughout the Period of Restoration." Report of Robert J. Walworth, CPA dated Nov. 14, 2014 at 3-5 (Pg ID 2662-65) (citing figures from defendants' own financial statements showing that it operated at a net loss in four out of the five years 2007 through 2011).

The plaintiff has not offered evidence to establish a genuine issue of fact for trial on this claim.

### K.  Lane Inspections

The plaintiff submitted a claim for $2,760, which it stated was the cost of lane inspections done by Capital Bowling Service and Brunswick in order to prepare their repair estimates. Cincinnati contends that those amounts are explicitly excluded under the policy provision that bars payment for any "expenses [] incurred to prove that [a] 'loss' is covered." Policy ¶ A(4)(e)(2) (Pg

ID 605).  The plaintiff responds that the policy expressly provides for payment of "necessary expenses that [the insured] incur[s] to prepare claim information [including] for (a) [t]aking inventories; (b) [m]aking appraisals; and (c) [p]reparing a statement of loss and other supporting exhibits."  Policy ¶ A(4)(e)(1).  The plaintiff contends that the inspections were not conducted to prove that the loss was covered, but for the purpose of making appraisals of the damage and preparing the statement of loss, and that Cincinnati in fact relied upon those repair estimates in tendering its actual cash value payments amounting to more than $600,000.

Assuming that the amounts stated in the proof of loss represent payments to Capital Bowling Service and Brunswick for inspections undertaken in order to prepare their repair estimates, the lane inspection expenses explicitly are allowed under Policy section A(4)(e)(1), and the plaintiff is entitled to submit its proofs at trial for those expenses.

## L.  Accounting and Legal Services

As with the lane inspection expense claim, Cincinnati argues that the claim of $10,000 for "accounting services for business interruption" and "legal services" are excluded as "expenses [] incurred to prove that [a] "loss" is covered" under Policy section A(4)(e)(2).  The plaintiff contends that the charges are allowed as necessary expenses related to the preparation of the proof of loss and supporting exhibits, charged by its accountants, attorneys, and "various other third parties who prepared various exhibits to Plaintiff's proof of loss."  The plaintiff does not specifically identify the "various third parties" or "various exhibits" at issue.  Moreover, the only examples of "supporting documents" relating to its proof of loss that the plaintiff cited are "Doc #23-4, Exhibits 10-12" and "Ex. 38, C&O613-15."  ECF Document Number 23-4 is the plaintiff's interim sworn proof of loss.  After reviewing that filing, the Court cannot find anything in it denoted as "Exhibits

10-12."  The Exhibits attached to and referenced in the proof of loss are numbered from 1 through 5 (including "2" and "2A"), and no exhibits "10" or "12" are included or referenced.  The document filed as "Exhibit 38" to the plaintiff's response contains nothing more than a "billing statement" showing an amount due of $400 to Jim Welesnick for unspecified services, and an invoice in the amount of $1,500 from Capital Bowling Service for the same lane inspection discussed above (the plaintiff separately claimed $1,500 for a "lane inspection" by Capital Bowling in line item 11 of its proof of loss).

If the plaintiff could establish that these expenses were incurred solely for the purpose of preparing its proof of loss or supporting exhibits, then they might be compensable.  Unfortunately for the plaintiff, however, it has not suggested what, if anything, its attorneys provided in the way of "legal services" other than aiding and advising the plaintiff in litigating a coverage dispute with its insurer, which is activity expressly excluded under the policy as related to an attempt to prove that a loss is covered.  The claim for "accounting services for business interruption" is entirely unsubstantiated, and the plaintiff's argument that the services were rendered in aid of preparing its proof of loss is particularly specious, since its accountant admitted that he never performed any analysis of or calculations relating to losses due to business interruption.  The plaintiff vaguely refers to "various exhibits" to its proof of loss prepared by "various third parties," but it has failed to cite any actual examples of such documents in the record, or to identify any of the third parties who prepared them.  The defendant therefore is entitled to judgment as a matter of law as to the plaintiff's claim for these purported accounting and legal services.

### M.  Counterclaim

The defendant has alleged in its counterclaim that the plaintiff breached the insurance contract in various ways.  One allegation is that the plaintiff committed fraud by submitting a claim for lost business income that omitted expenses for rents paid in the calculation of the plaintiff's profits.  However, Cincinnati has offered nothing more in the way of specific facts other than the omission of "rents paid" from the plaintiff's financial statements to support its counterclaim for breach premised upon the "fraud or misrepresentation" provision of the policy, and its congruent affirmative defense.  The defendant contends that, under the terms of the policy, the entire commercial property coverage part is voided by any misrepresentation of a material fact supporting a claim, regardless of the relation of that amount to any other portions of the claim.  The defendant asserts that after its adjuster questioned the apparent disconnect between the plaintiff's losses or small profits shown in past financial statements and its submissions showing a large profit for 2012, the plaintiff never responded and never provided any explanation for the discrepancy.  Cincinnati contends that it never received the financial records that revealed the omission of "rents paid" from the May 2012 financial statement until it extracted them from the plaintiff during discovery in the present litigation.

The plaintiff responds that, to the extent that any rents were omitted from the "interim" May 2012 financial statement, that omission was inadvertent and was a mistake by plaintiff's accountant, James O'Brien.  The plaintiff contends, moreover, that the rents were included in a "final" year-end financial statement prepared by O'Brien and submitted to the insurer, and that, in any event, any "misrepresentation" was immaterial, because the plaintiff's lost income exceeded the policy limit of $100,000 for business income loss whether "rents paid" were included or not.

-33-

As the Court noted in an earlier opinion denying the defendant's motion to amend its counterclaim, whether the "rents paid" were omitted is immaterial to the amount of the plaintiff's claim for lost income, because, to the extent any "rents" were omitted as expenses, the plaintiff's profits would have been "misrepresented" by no more than the amount of those rents. But the policy expressly permits recovery of *both* "net profit or loss before income taxes" *and* "normal operating expenses," which plainly would include any rents paid. It is self-evident that any overstatement of "profits" in the financial statement was offset dollar for dollar by the understatement of "expenses" that were left out.

To prove that the plaintiff breached the contract by committing fraud, the defendant must show "'(1) [t]hat [plaintiff] made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by [defendant]; (5) that [defendant] acted in reliance upon it; and (6) that he thereby suffered injury.'" *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 815-16 (1976) (quoting *Candler v. Heigho*, 208 Mich. 115, 121, 175 N.W. 141, 143 (1919)). The absence of any one of these elements "'is fatal to a recovery.'" *Ibid.*

For the same reasons discussed in the order denying the defendant's motion to amend its counterclaim, the alleged omission of "rents paid" is insufficient as a matter of law, under the plain terms of the policy, to show that the plaintiff "misrepresented" any material fact relating to its claim for lost business income, because the representation was not material. The plaintiff therefore is entitled to judgment as a matter of law dismissing the defendant's counterclaim to the extent that

it is premised upon "fraud or misrepresentation" and its parallel affirmative defense based on the same facts.

Cincinnati also alleges in its counterclaim that the plaintiff breached the insurance contract by not cooperating in the claim adjustment process. That lack of cooperation, it alleges, consists of the plaintiff's failure to furnish documents that support its various items of alleged loss. In the usual case where substantiation of the loss is inadequate, the insured simply loses on that point and is barred from recovering any unsubstantiated amounts. However, in addition to seeking to avoid payment on the claim, the defendant and counter-plaintiff insurer here also seeks to recover as part of its damages "all costs and expenses of investigation of the claim and defense of this litigation." The defendant did not cite any authority in its briefing to support its claim that, absent fraud, it may recover its costs and attorney fees for investigating or litigating an unsubstantiated claim on which it ultimately is found not to be obligated to pay. The cases on point hold otherwise.

In Michigan, "recovery of attorney fees incurred as a result of an insurer's bad-faith refusal to pay an insured's claim is governed by the American rule." *Burnside v. State Farm Fire & Cas. Co.*, 208 Mich. App. 422, 430, 528 N.W.2d 749, 753 (1995). "Under the American rule, attorney fees are generally not allowed, as either costs or damages, unless recovery is expressly authorized by statute, court rule, or a recognized exception." *Id.* at 426-27, 528 N.W.2d at 751. As the Michigan Court of Appeals explained, an insured plaintiff's remedy for bad faith delay or breach of the policy relating to payment of its claim is recovery of penalty interest, which is provided for under Michigan's Uniform Trade Practices Act, Mich. Comp. Laws § 500.2001 *et seq. Id.* at 431, 528 N.W.2d at 753; *see also No Limit Clothing, Inc. v. Allstate Ins. Co.*, No. 09-13574, 2011 WL 96869, at *6 (E.D. Mich. Jan. 12, 2011) ("[A]ttorney fees are not available as consequential damages

-35-

in a breach of an insurance contract claim, even if the breaching party acted in bad faith."); *Barrow v. AMICA Mut. Ins. Co.*, No. 06-12186, 2007 WL 1053206, at *2 (E.D. Mich. Apr. 9, 2007) (citing *Burnside*) ("[I]t is clear that Plaintiff is not entitled to attorney fees for litigation resulting from the breach of an insurance contract."); *Hartford Ins. Co. v. Miller*, No. 04-10314, 2006 WL 2844124, at *17 (E.D. Mich. Sept. 30, 2006) ("The [insured plaintiffs] are not entitled to attorney's fees or damages for bad faith, but they are entitled to penalty interest.").  The cases cited (and all of the cases on point following the rule in *Burnside*) all involved attempts by an insured to recover attorney fees for an alleged bad faith breach by an insurer; but the defendant here has not cited any authority for the proposition that the result ought to be otherwise when it is the insurer seeking to recover the same species of consequential damages as a result of the insured's breach of a condition precedent to suit provision.

Similarly, at least one Michigan court has held that costs of investigation of a claim are not recoverable as consequential damages for an insured's failure to cooperate:

> With respect to plaintiff's request to recover the expenses it incurred in investigating Mary's claim, plaintiff failed to show that these expenses were the direct, natural, and proximate result of Mary's breach.  The purpose of the investigation was to determine the validity of Mary's insurance claims in the first instance, i.e., to determine whether she was in breach of the policy's terms.  The investigation did not result from Mary's breach. Thus, plaintiff failed to show that the expenses it incurred in investigating Mary's claim were the natural result of Mary's breach.

*Home Owners Ins. Co. v. Griffith*, No. 312707, 2014 WL 5462597, at *6 (Mich. Ct. App. Oct. 28, 2014). Finally, courts are reluctant to recognize contract or tort theories that would allow an insurer to recover attorney's fees and investigative costs from an insured incurred before or after an alleged violation of a policy condition.  *See State Auto Property and Cas. Ins. Co. v. Hargis*, --- F.3d ----, 2015 WL 2081922, at *7 (6th Cir. May 6, 2015) (refusing to recognize a cause of action in favor of

-36-

an insurance company based on "reverse bad faith," finding that "[a] common law tort claim for reverse bad faith has not been recognized in any jurisdiction").  Although the failure to cooperate in the adjustment process may support the defendant's affirmative defenses, it will not provide a basis for affirmative relief.  Therefore, the counterclaim will be dismissed.

## N. Consequential Damages

The plaintiff addresses its claim for loss of business income in its response to the defendant's motion for summary judgment with the additional argument that it is "entitled to recover consequential damages from Defendant's unreasonable delay in adjusting (and approving) Plaintiff's claim," including "continued business income losses (i.e., because Plaintiff has been unable to contract for the necessary repairs to reopen)," and "the additional property damage Plaintiff suffered from [a second flood that occurred in February 2014 due to a frozen and burst water pipe in te plaintiff's idle and unheated facility] (i.e., because Plaintiff would have been able to prevent the event altogether or, at minimum, promptly mitigate its losses, had it been open for business at that time)," citing *Lawrence v. Will Darrah & Associates, Inc.*, 445 Mich. 1, 516 NW2d 43 (1994).  The defendant did not respond to this argument in its reply.

Under Michigan law, "consequential damages [may] be recovered [in an action for breach] if they were in the contemplation of the parties at the time the contract is formed."  *Lawrence v. Will Darrah & Associates, Inc.*, 445 Mich. 1, 11, 516 N.W.2d 43, 47 (1994) (holding that consequential damages for lost profits are available on a breach of contract claim against an insurer where "the parties knew or had reason to know that lost profits would occur if the defendants breached the contract").  The Michigan rule permits the plaintiff to recover "damages that arise naturally from the breach, or which can reasonably be said to have been in contemplation of the parties at the time

the contract was made." *Ibid.* (quotations and footnotes omitted).  Notwithstanding this general rule, "the doctrine of avoidable consequences prevents parties from recovering damages that could have been avoided by reasonable effort." *Braverman v. Granger*, 303 Mich. App. 587, 598, 844 N.W.2d 485, 492 (2014) (citing *Shiffer v. Bd. of Ed. of Gibraltar Sch. Dist.*, 393 Mich. 190, 197, 224 N.W.2d 255, 258 (1974)).  As the Michigan Supreme Court explained in *Shiffer*:

> Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages.  The person wronged cannot recover for any item of damage which could thus have been avoided.

393 Mich. at 197, 224 N.W.2d at 258.

The plaintiff is entitled to recover consequential damages caused by any extension of its business interruption that is determined to be due to the defendant's unreasonable refusal to authorize the proper payment due on its claim, as long as such damages "were in the contemplation of the parties at the time the contract is formed."  *Lawrence*, 445 Mich. at 11, 516 N.W.2d at 47.  The plaintiff's claims for lost liquor and beer that "went bad" during its extended shutdown certainly qualify as foreseeable and within the purview of the parties when the contract was formed, since its provisions expressly provide coverage for loss of "stock" and other business personal property.  The plaintiff may submit proofs as to the loss of its beverage inventory at trial.

The claims for lost business income exceeding the policy limits likewise would be recoverable — if the plaintiff had provided any evidence at all to substantiate such a loss.  However, on the record now before the Court, the plaintiff cannot pursue any claim for lost business income, "consequential" or otherwise, because it has offered no admissible evidence to suggest either the extent of such an injury, or that it occurred at all.  The defendant is entitled to a judgment as a matter of law barring the plaintiff from seeking any consequential damages for lost business income.

-38-

Moreover, certain categories of damages to which the plaintiff has alluded — most prominently its recently suggested claim for damages caused by a second water event at the property in early 2014, long after the policy had lapsed — are as a matter of law well beyond the scope of "consequential damages" that properly could be awarded. The complementary "doctrine of avoidable consequences prevents parties from recovering damages that could have been avoided by reasonable effort." *Braverman*, 303 Mich. App. at 598, 844 N.W.2d at 492 (citing *Shiffer*, 393 Mich. at 197, 224 N.W.2d at 258). "[I]t is incumbent upon the [plaintiff] to use such means as are reasonable under the circumstances to avoid or minimize [its] damages," and it "cannot recover for any item of damage which could thus have been avoided. *Shiffer*, 393 Mich. at 197, 224 N.W.2d at 258. The plaintiff contends that if its property had been in operation it could have promptly addressed the second water event. Whether or not that is true, the plaintiff has failed to show either that damages so remote in time and chain of causation "were in the contemplation of the parties at the time the contract [was] formed," or that they could not have been avoided by "such means as are reasonable under the circumstances" to prevent or detect such an event, such as by maintaining heat in the premises. The defendant is entitled to judgment as a matter of law barring the plaintiff from pursuing any damages relating to the 2014 water event.

## O. Conditions Precedent

Cincinnati contends that the plaintiff's lawsuit is barred because it did not satisfy all the requirements listed in the insurance policy under the "Legal Action Against Us" section, which states that "[n]o one" may sue the insurance company unless there has been full compliance with all of the conditions in the coverage section of the policy. Cincinnati appears to have abandoned its contention that the plaintiff "failed to cooperate" in the investigation of its claim by unreasonably

refusing to submit to an examination under oath when one was requested by the insurer.  Instead, it now relies entirely on the plaintiff's failure to provide documents to substantiate the various specific line items claimed in the sworn proof of loss (all of which were discussed above). Cincinnati contends that certain financial statements that it timely demanded were not disclosed to its accountant until well into the course of discovery in the present litigation, and the plaintiff "tacitly admitted" that it failed timely to disclose those records by seeking to "amend" the proof of loss after the complaint was filed.

As a general matter, unless the insured submits a proof of loss within the time prescribed in the policy or by agreed extension, he may not sue the insurer for not paying the claim, "because compliance with the requirement is considered a condition precedent to the liability of the insurer." *Auto-Owners Ins. Co. v. Gallup*, 191 Mich. App. 181, 183-84, 477 N.W.2d 463, 464 (1991). However, the parties agree that Michigan courts "apply the rule of substantial compliance to cases involving the sufficiency of a proof of loss."  *Wineholt v. Cincinnati Ins. Co.*, 179 F. Supp. 2d 742, 749 (W.D. Mich. 2001); *see also Gibson v. Group Ins. Co.*, 142 Mich. App. 271, 275-76, 369 N.W.2d 484, 486 (1985).  "[T]he proper inquiry in determining substantial compliance [with a proof-of-loss condition] is whether the proof of loss fulfilled its three intended purposes: (1) allowing the insurer an opportunity to investigate the loss; (2) allowing the insurer to estimate its rights and liabilities; and (3) preventing fraud."  *Wineholt*, 179 F. Supp. 2d at 752.  "[A]s a general rule, [where] a [policy] provision [constitutes] a condition precedent to filing the action, [] the failure to comply with such a condition is not an absolute bar to recovery, but acts to suspend the right to recovery until the [condition is fulfilled]."  *Yeo v. State Farm Ins. Co.*, 219 Mich. App. 254, 258, 555 N.W.2d 893, 895 (1996).

-40-

In this case, there is no dispute that the plaintiff submitted its "sworn interim proof of loss" by the extended deadline to which the insurer agreed. The dispute here is not over whether the proof of loss was timely or sworn, but whether the documents and other information submitted in support of the proof of loss were sufficient to establish that the plaintiff was entitled to coverage for the amounts stated. It is undisputed that the interim sworn proof of loss was timely submitted and properly signed. The proof of loss stated specific amounts that the insured claimed, and it is undisputed that "some" documentation was included with it. Cincinnati denied the claim on the basis that the items listed were unsubstantiated, unnecessary, excluded under specific provisions, or not covered by the policy at all. In that sense, the proof of loss certainly was sufficient for the insurer to make a timely review of the claim and to determine that it was not obligated to pay.

Moreover, Cincinnati has not made any argument or suggested any evidence to show that the plaintiff failed to substantiate the central, dominant line item in its claim, which was the more than $1.1 million for coverage to replace its damaged wood bowling lanes with new wood lanes. The plaintiff attached to its proof of loss an estimate from Capital Bowling Service supporting that line item, Am. Compl., Ex. 3, Proposal dated June 14, 2013 (Pg ID 660), and Cincinnati never has argued that there was anything unsubstantiated or improper about that estimate, in so far as it reflects a fair measure of the cost to install new wood lanes. Instead, Cincinnati contends that the plaintiff's lack of substantial compliance is established because (1) the plaintiff never produced certain documents in support of its business income claim until well into the course of this litigation; and (2) the plaintiff never produced any proof to substantiate the claimed amounts for debris removal; replacement of overhead lighting; removal and replacement of the front main counter; payment of a "general contractor fee" to the insured; loss of "spoiled" liquor and dry-rotted machine belts; and

-41-

cash payments to several individuals for various odd jobs performed in cleaning up and securing the facility after the 2012 water event.

The Court's ruling on the substance of the plaintiff's claims for business income, debris removal, replacement of overhead lighting and "dry-rotted" machine belts, and the general contractor fee moots the defendant's substantial condition precedent argument. The failure to supply any or adequate information as to certain line items stated in the proof of loss does not foreclose the plaintiff from recovering for other items that it did adequately substantiate; the plaintiff may proceed on its principal claim for the damage to the lanes, since it is undisputed that it submitted adequate information to substantiate that part of the claim. *Shathaia v. Travelers Casualty Insurance Co. of America*, 984 F. Supp. 2d 714, 726 (E.D. Mich. 2013).

On the loss of "spoiled" liquor, the insurer evidently does not dispute the amount claimed or the nature of the loss, but contends only that the amount is not covered because the liquor was not affected by any "direct physical loss." However, for the reasons discussed above, this line item is more properly construed as seeking consequential damages arising from the extended business interruption rather than payment for an actual covered loss.

As to the claim for cash payments made to various individuals, the plaintiff has offered his own testimony that the payments were made, in the amounts stated, for the services listed. The insurer does not contend that the services were not necessary to the repair process or beyond the scope of coverage, only that they are unsupported by any documentation such as canceled checks, invoices, or receipts. But it does not dispute that the plaintiff has offered all that it says if has to substantiate those amounts, which is the plaintiff's owner's sworn statement. The insurer found that support inadequate to justify payment, and the jury may as well. But there is nothing in the record

-42-

to suggest that the plaintiff failed to cooperate to the extent of providing all the information in its possession to support its claim for the "labor hours" line item.

The defendant is entitled to judgment as a matter of law as to those specific items noted above for which the plaintiff has offered no proof sufficient to support a finding that it incurred a covered loss under the policy. Although the insurer need not pay any claimed amounts for the unsubstantiated items, the plaintiff is entitled to judgment as a matter of law dismissing the counterclaim for breach of contract based on any alleged "failure to cooperate" by the insured by failing to produce any or adequate information to support its claims for those items. A judgment that the insurer need not pay anything against the specific unsupported line items fully vindicates the insurer's rights under the policy, and any independent recovery on the counterclaim for breach is barred as a matter of law.

### P. Appraisal Remedy

The plaintiff contends that Cincinnati has waived its right to make a demand for an appraisal if the plaintiff prevails, because it never made any such demand before the commencement of the litigation. According to the plaintiff, the appraisal provision in the policy is intended to be exercised on a pre-litigation basis only, because it provides that the insurer retains the right to deny a claim notwithstanding the outcome of any appraisal, which it obviously would have no right to do if the plaintiff prevails and secures a judgment obligating the insurer to pay its claim in whole or in part.

The defendant responds that the plaintiff's reading of the appraisal remedy clause and its contention that Cincinnati waived its rights under that provision are unreasonable as a matter of law, particularly where the insurer was still investigating the claim when the plaintiff filed suit, and where it asserted its right to an appraisal in its answer and affirmative defenses.

The plaintiff's argument is unavailing, particularly where the insurer asserted the right to demand an appraisal in its affirmative defenses. As the Michigan Court of Appeals has explained, the "appraisal process cannot legally settle coverage issues," and where "the parties cannot agree on coverage, a court is to determine coverage in a declaratory action before an appraisal of the damage to the property." *Auto-Owners Ins. Co. v. Kwaiser*, 190 Mich. App. 482, 487, 476 N.W.2d 467, 469-70 (1991). It is undisputed that the policy provides that, if the parties "disagree on the value of the property . . . or the amount of 'loss', either may make a written demand for appraisal." Policy ¶ D(2) (Pg ID 619). The plaintiff has pointed to nothing in Cincinnati's conduct or communications that would suffice to show that it intentionally relinquished its right under that clause to demand an appraisal of the loss amount. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 521 (6th Cir. 2002) (holding that the application of waiver or estoppel is not appropriate where an insurer has expressly reserved its right to present additional defenses in a written denial). The defendant is entitled to judgment as a matter of law barring the plaintiff from opposing any timely demand for an appraisal, if the insurer elects to exercise its right to demand an appraisal following the entry of a judgment for the plaintiff as to coverage.

III.

For the reasons stated, the plaintiff is entitled to a judgment as a matter of law on the defendant's counterclaim for breach of contract, which will be dismissed in its entirety. The plaintiff also is entitled to judgment as a matter of law on the defendant's affirmative defense of fraud. The defendant is entitled to a judgment as a matter of law on the plaintiff's claims for damage to light fixtures, debris removal, the general contractor fee, business personal property, lost business income, and accounting and legal services.

-44-

Accordingly, it is **ORDERED** that the plaintiff's motion for partial summary judgment [dkt. #78] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the defendant's motion for partial summary judgment [dkt. #64] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the defendant's amended counterclaim is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the plaintiff's claims for $141,000 for damage to light fixtures due to condensation; $70,000 for debris removal; $365,988.52 as a "general contractor fee" payable to the insured; $22,758.51 for business personal property; $200,000 for lost business income for the years 2012 and 2013; and $10,000 for "accounting and legal services" are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the plaintiff may pursue its claim for consequential damages as to the alleged loss of business inventory by "spoilage" of liquor and beer during its extended business interruption. In all other respects, the plaintiff's claims for consequential damages are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the motions are **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  May 31, 2015

-45-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 31, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI