UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOWLERS' ALLEY, INC.,

                         Plaintiff,                             Case Number 13-13804

v.                                                   Honorable David M. Lawson

THE CINCINNATI INSURANCE
COMPANY,

                         Defendant.

_____/

## OPINION AND ORDER ON DAMAGES ISSUES

During the initial and recent pretrial conferences in this insurance contract dispute, the parties posed questions to the Court on several issues not addressed in their previous dispositive motions or motions *in limine*. Per the Court's direction, they have raised two of them in their trial briefs, so the Court can issue rulings on those questions before trial, in order to clarify the scope of the parties' presentations on certain aspects of the plaintiff's claims for damages.

The two issues are (1) whether the plaintiff would be entitled to penalty interest on the full amount of the replacement cost for its bowling lanes under the Michigan Uniform Trade Practices Act, Mich. Comp. Laws § 500.2006, if the plaintiff prevails on its underlying claim for those damages; and (2) whether the plaintiff is entitled to recover the full amount of the actual cost to repair or replace its lanes when, eventually, it completes the repair or replacement, or whether its recovery would be limited to the cost of repair or replacement estimated at the time of the loss, as stated in the plaintiff's sworn proof of loss. The defendant contends that it cannot be accountable for penalty interest for a late payment when it has no obligation to pay until the replacement has occurred (thereby establishing the amount of the loss), and that event has not happened yet. But the defendant also insists that the damage was complete and its obligation fixed on the date of the loss,

so the subsequent rise in replacement costs is irrelevant to the plaintiff's claim. Those positions are inconsistent. Either the damages were fixed, in which case the penalty interest statute is in play, or the damages have not been finalized, in which case there can be no penalty interest and the amount owed is the actual expense to repair, capped by the insurance policy limits. Based on the contract language and the prevailing law, the better view is that the plaintiff is entitled to the actual cost to replace its damaged property "with other property . . . [o]f comparable material and quality" at the time the replacement is made, and that the plaintiff is not entitled to penalty interest under Mich. Comp. Laws § 500.2006, unless payment thereafter is delayed for the statutory period.

## I. Background

As noted in previous opinions issued in this case, the plaintiff purchased "replacement cost" coverage as part of its hazard insurance policy with the defendant, Cincinnati Insurance Company. The plaintiff contends that a flood at its bowling alley in May 2012 damaged a number of wooden bowling lane surfaces. On April 4, 2013, Cincinnati sent the plaintiff a request for a proof of loss. Bowler's Alley requested and Cincinnati granted an extension of time to complete the proof of loss. On June 18, 2013, the plaintiff submitted a sworn "interim" statement of proof of loss with a $2.6 million price tag, which Cincinnati rejected on July 17, 2013. The present dispute over the cost of addressing the damage to the wooden bowling lanes focuses on whether the defendant may satisfy its obligation under the policy by covering the wooden lanes with synthetic overlays. The plaintiff insists that the defendant must pay for replacing all the lanes with similar wooden lanes.

The replacement cost endorsement, Section F(3), states that:

c.      You may make a claim for "loss" covered by this insurance on an "Actual Cash Value" basis instead of on a replacement cost basis. In the event you elect to have [a] "loss" settled on an "Actual Cash Value" basis, you may still

make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the "loss".

d.   We will not pay on a replacement cost basis for any "loss":

    (1)   Until the lost or damaged property is actually repaired or replaced with other property of generally the same construction and used for the same purpose as the lost or damaged property; and

    (2)   Unless the repairs or replacement have been completed or [are] at least underway within 2 years following the date of "loss".

e.   We will not pay more for "loss" on a replacement cost basis than the least of:

    (1)   The Limit of Insurance applicable to the lost or damaged property;

    (2)   The cost to replace, on the same "premises", the lost or damaged property with other property:

        (a)   Of comparable material and quality; and

        (b)   Used for the same purpose; or

    (3)   The amount you actually spend that is necessary to repair or replace the lost or damaged property.

Cincinnati Insurance has argued that the plaintiff is barred from pursuing its claim for the full replacement cost of its damaged wood bowling lanes because it failed to begin or complete repairs of its lanes within the two-year time limit under the policy. The Court rejected that argument in an earlier ruling, citing *Smith v. Michigan Basic Prop. Ins. Ass'n*, 441 Mich. 181, 190-91, 490 N.W.2d 864, 867-68 (1992), in which the court held that a policy clause conditioning the payment of replacement cost benefits on the completion of repairs is not an obstacle to entry of judgment in favor of the plaintiffs who, for obvious economic reasons, had not yet commenced repairs when they filed suit over the coverage dispute. The court stated that the insureds could obtain replacement costs if they commenced repairs within a reasonable time after a favorable judgment was entered.

Although Cincinnati Insurance made a cash payment of more than $600,000 based on early estimates that called for resurfacing the damaged alleys with synthetic overlays, the plaintiff apparently has not commenced any repairs and likely has no intention of doing so until it learns of the outcome of this lawsuit. And not surprisingly, the plaintiff asserts that costs to complete the repairs have risen since May 2012. The plaintiff contends that Cincinnati Insurance should have

-3-

paid for wooden lanes at the outset, and the delay in payment triggers the penalty interest statute. Cincinnati Insurance argues that the plaintiff should have undertaken repairs long ago, and whatever the jury determines is replacement property "of comparable material and quality," it cannot be accountable for the increase in repair costs over the life of this dispute.

## II.  Penalty Interest

The Michigan Uniform Trade Practices Act (UTPA) provides for the assessment of interest against an insurer that fails timely to pay a claim within 60 days after submission of a satisfactory proof of loss:

> (1)    A person must pay on a timely basis to its insured . . . the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured . . . 12% interest, as provided in subsection (4), on claims not paid on a timely basis.
> . . .
> (4)    If benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum, if the claimant is the insured. . . . The interest shall be paid in addition to and at the time of payment of the loss.  If the loss exceeds the limits of insurance coverage available, interest shall be payable based upon the limits of insurance coverage rather than the amount of the loss.

Mich. Comp. Laws § 500.2006.  "The statute is intended to provide a penalty to be assessed against recalcitrant insurers who procrastinate or are dilatory in paying meritorious claims in bad faith." *McCahill v. Commercial Union Ins. Co.*, 179 Mich. App. 761, 779, 446 N.W.2d 579, 587 (1989) (citing *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 426 Mich. 127, 136 n.5, 393 N.W.2d 161, 164 n.5 (1986); *Medley v. Canady*, 126 Mich. App. 739, 743, 337 N.W.2d 909, 911 (1983)). "Unlike the 6% judgment interest provision of M.C.L. § 600.6013, [the penalty interest provision under the UTPA] evinces no intent to compensate a plaintiff for the delay in recovering funds rightfully his."  *Medley*, 126 Mich. App. at 743-44, 337 N.W.2d at 911.  And "the claimant is

-4-

entitled to 12 percent interest, irrespective of whether the claim is reasonably in dispute." *Griswold Properties, L.L.C. v. Lexington Ins. Co.*, 276 Mich. App. 551, 566, 741 N.W.2d 549, 557 (2007) (quotations omitted). But "[a]s a penalty, the statute is to be strictly construed." *Medley*, 126 Mich. App. at 744, 337 N.W.2d at 911.

The plaintiff has not identified a Michigan case allowing an award of penalty interest on replacement cost benefits paid to a plaintiff, where the plaintiff did not complete repairs as required under the policy until after entry of judgment in its favor following a coverage dispute with the insurer. Instead, in support of its claim for penalty interest, the plaintiff cites principally *Pollock v. Fire Ins. Exch.*, 167 Mich. App. 415, 423 N.W.2d 234 (1988), in which the Michigan Court of Appeals affirmed a judgment awarding prejudgment interest to the plaintiff and excusing the plaintiff from performance of the repair completion provision of the policy before collecting on her judgment for the full cost of repairs. The *Pollock* court explained its reasoning as follows:

> [D]efendant's failure to pay on the claim hindered, and quite possibly even prevented, plaintiff from complying with her obligation to repair or replace the building. Had defendant immediately paid in good faith the actual cash value of the loss, holding the additional amount due under the replacement cost provision in reserve until the replacement was made or contracted for, or had otherwise worked with plaintiff to insure her financial ability to immediately proceed with the replacement or repair, a different result might be called for. However, defendant did not work with plaintiff to promptly pay the claim and enable her to repair or replace the building; rather, it did as much as possible to hinder plaintiff and delay or prevent the payment of the claim. We will not now allow defendant to raise as a defense plaintiff's failure to perform an act which defendant itself greatly hindered plaintiff from performing.

*Pollock*, 167 Mich. App. at 422, 423 N.W.2d at 237. However, as the defendant correctly points out, *Pollock* did not consider any claim for penalty interest under the UTPA, and the court there held only that the plaintiff was entitled to collect prejudgment interest, which is expressly allowed by a separate Michigan statute, Mich. Comp. Laws § 600.6013.

-5-

The defendant relies principally on *Dupree v. Auto-Owners Ins. Co.*, 497 Mich. 1, 857 N.W.2d 247 (2014), a case in which an appraisal panel had assessed both the replacement cost and actual cash value of the plaintiff's property, but in its ruling only expressly had awarded her the ACV amount.  The defendant insurer paid out on the ACV award, but refused to issue payment for the replacement cost value, because the plaintiff never submitted proof that she had completed repairs to her property, as the replacement cost provision of the policy required.  The court observed that "[t]he issue here pertains to a condition *precedent* that has not been met under the terms of the insurance policy, namely, submission of proof of actual loss," *Dupree*, 497 Mich. at 6, 857 N.W.2d at 249 (emphasis in original), and it held that "[b]ecause the appraisal award cannot be read as a 'conclusive' judgment for replacement cost, the terms of the replacement cost provision under the insurance policy control the scope of plaintiff's appraisal award.  Consequently, plaintiff's failure to submit proof of actual loss in accordance with that provision entitles her to only the actual cash value of her damaged personal property," *ibid.*, 857 N.W.2d at 249-50.

*Dupree* did not consider — or even mention — the insured's entitlement to penalty interest, but other decisions on point have held that the penalty interest statute cannot be triggered until the insurer is obligated to pay; and under typical replacement cost provisions, that does not occur until repair work has been completed.  *Helsel v. Farm Bureau Gen. Ins. Co.*, No. 276749, 2008 WL 2357546, at *5 (Mich. Ct. App. June 10, 2008) ("Because defendant was not required to pay the replacement cost to plaintiffs before the actual replacement of the dwelling, there was no delay in payment, and therefore the 12 percent penalty interest associated with the replacement cost should not have been imposed by the trial court."); *see also Cincinnati Ins. Co. v. Vemulapalli*, No. 309980, 2013 WL 3942548, at *2 (Mich. Ct. App. July 30, 2013) ("We note that, in any event, a proof of loss

-6-

could not have been submitted until after this Court's remand on December 6, 2002, because any liability had not triggered yet because defendant had yet to replace the fire alarm system.") (remanding for consideration of whether the requirement that the insured submit a satisfactory proof of loss was excused under Mich. Comp. Laws § 500.2006(3) by the failure of the insurer promptly to provide notice of what materials would constitute a satisfactory proof of loss).

Other Michigan decisions have held that where the insurer did not entirely refuse to pay the insured's claim, but instead made significant ACV payments that the insured did not make any effort to spend on repairs, the reasoning of *Pollock* does not apply:

> We [] note that the insurance compan[y] in [] *Pollock* initially denied the plaintiffs' claims, and refused to pay anything to the insured. Based upon the record, we are unconvinced that [the insurer's] notification that the co-insurance provision would apply to a replacement cost claim by plaintiff actually hindered plaintiff's ability to replace the property. The record shows that plaintiff's inquiries into whether it could obtain financing for the building's reconstruction were meager, and that no loan applications regarding any financing were ever completed. In addition, plaintiff's president signed a "Sworn Statement of Loss" that indicated his agreement that the building's actual cash value was $5,338,000, and that plaintiff spent nearly all of its actual cash value payment, instead of using it for the building's reconstruction.

*AMVD Ctr., Inc. v. Crum & Forster Ins.*, No. 252467, 2005 WL 1524517, at *3 (Mich. Ct. App. June 28, 2005). That reasoning is persuasive here, where it is undisputed that the insurer promptly paid out the actual cash value of the initial estimate for a repair using synthetic overlays, albeit based on a total cost of repair that the plaintiff contends was less than one-third the cost to construct new wood lanes that would satisfy the "comparable material and quality" provision of the policy. The penalty interest statute is not triggered until the amount of the replacement cost is established and the claim is not paid "60 days after satisfactory proof of loss was received by the insurer." Mich. Comp. Laws § 500.2006(4).

III.  Replacement Cost Valuation

Cincinnati Insurance contends that it cannot be responsible for the increase in construction costs for replacing the damaged property because the loss under the policy is fixed at the time of the loss itself.  The defendant correctly points out that, in a narrow line of decisions, "Michigan courts have held that the amount due from an insurer is fixed as of the date of the [loss]."  *J.C. Wyckoff & Associates v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1490 (6th Cir. 1991); *Pink v. Smith*, 281 Mich. 107, 113, 274 N.W. 727, 730 (1937) ("The time of the fire and of the loss established the rights of the parties, and in the absence of an election by the company to repair, the amount of the loss payable to the mortgagee became fixed as of that time."); *Kass v. Wolf*, 212 Mich. App. 600, 605, 538 N.W.2d 77, 79 (1995) ("Generally, the rights of insured parties are fixed at the time of the loss.") (citing *Booker T. Theatre Co. v. Great American Ins. Co. of New York*, 369 Mich. 583, 120 N.W.2d 776 (1963); *Root v. Republic Ins. Co.*, 82 Mich. App. 446, 266 N.W.2d 842 (1978)).

However, all of those decisions involved claims by various parties and counter-parties to mortgages or land contracts on real property, where the insurer had paid out the assessed value of the loss to the property as of the date of the loss, without regard to any ensuing transactions affecting the value of either the property or the debt.  As the *Kass* court explained, where a policy of insurance provides for payment solely to a mortgagee to cover its interest in a mortgaged property, "[t]he nature of the interests [is] defined in the mortgage and land contract agreements, but the extent of the interests [is] determined at the date of loss."  *Kass*, 212 Mich. App. at 605, 538 N.W.2d at 79. The *Pink* court held that the plaintiff mortgagee was entitled to the full amount of payments made by the insurer to it based on the value of the loss, and the fact that the mortgagor had completed repairs on its own, without consulting the mortgagee, was immaterial to the allotment of any such

-8-

payments.  The *Kass* court held that the mortgagee was not entitled to collect from the insurer the value of any interest that accrued on the mortgage debt after the date of loss, because the amount of loss was fixed as the amount of debt outstanding at the time of the loss.

None of those cases address the present situation, however, where an insurer is not obligated to pay the cost of replacing damaged property until after the repair or replacement actually occurs. And the cases certainly do not contemplate liability for costs that are significantly higher than the originally estimated cost of repair claimed by the insured, where the increase is due to a delay of years in accomplishing the repairs, caused by the insurer's refusal to approve payment of the full proposed replacement cost, during the extended litigation of the parties' coverage dispute.  Neither party has cited such a case, and the Court has found none.

But when determining the obligation of a party under a contract, the first objective is to "honor the intent of the parties," *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994), and the prime source of that intent is the plain language of the agreement, *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ("Well-settled principles of contract interpretation require one to first look to a contract's plain language.").  The plain language of the policy expressly states that the insurer will pay, under the optional "replacement cost" coverage provision, "[t]he *amount you actually spend* that is *necessary to repair or replace the lost or damaged property*" (capped by the policy limits), or "[t]he cost to replace, on the same 'premises', the lost or damaged property with other property (a) [o]f comparable material and quality; and (b) [u]sed for the same purpose."  Contrast that language with the ACV provision of Section D(7)(a), which states that the insurer "will determine the value of Covered Property in the event of 'loss' as . . . 'Actual Cash Value' as of the time of 'loss.'"  Unlike the ACV provision, the

-9-

replacement cost provision does not peg its value assessment to the time of the loss; instead, it expressly states that the insurer "will not pay on a replacement cost basis for any 'loss' *[u]ntil the lost or damaged property is actually repaired or replaced with other property* of generally the same construction and used for the same purpose as the lost or damaged property."

The plain language of the policy states that the valuation of a loss payable under the replacement cost provision depends on the actual amount expended to complete a repair or replacement. That amount by definition cannot be known until such sums are expended and repairs completed, whenever that may be.

The Court has held already that the plaintiff could not reasonably undertake to begin a repair project with an estimated cost of more than $1.1 million — now purported by the plaintiff to be even higher due to inevitable increases in the cost of labor and materials over the span of years since the loss occurred — in the face of the insurer's insistence that it would pay, in total, less than one-third of the proposed cost of the work in question. If it turns out that the repairs originally authorized by the insurer are sufficient in fact to qualify as being of "comparable material and quality" to the more expensive option desired by the plaintiff, then the defendant will be obligated to pay, at most, no more than the amount for such repairs that it authorized at the time of the loss (i.e., the full cost of the original repair estimate based on synthetic lane overlays, which the insurer approved, and on which it based its previous actual cash value payout calculations). If, however, the jury finds that the insurer's conception of "comparable material and quality" and its proposed method of repair do not sufficiently address its obligations under the policy, then the defendant will be obligated to pay those amounts reasonably necessary and actually expended to remedy the loss to those of the plaintiff's lanes that suffered actual physical damage from the 2012 water event, by such means as

-10-

the jury may determine that do satisfy the policy, as and when the plaintiff may complete such work within a reasonable time after entry of judgment allowed by the Court.

The defendant contends that most or all of the purported increase in the plaintiff's recently obtained estimates for lane replacement work is not due to rises in the cost of labor and materials for the originally proposed work, but instead reflects an enlargement of the scope of the work due to catastrophic damage to the plaintiff's wood lanes caused by a February 2014 flood. If the plaintiff's proofs establish that the present cost of the originally proposed scope of work — the work necessary to remedy the loss due to physical damage resulting solely from the 2012 flood — has increased due to the lapse of years since the loss, then it may claim the full amount that it actually eventually may spend to complete the work necessary to remedy the original scope of loss and to satisfy the "comparable material and quality" term of the policy. However, as the Court previously has held, the plaintiff may not proceed on any claims stemming from damage to its property due to the February 2014 flood. If the defendant can show that any part of the plaintiff's claimed repair cost is premised on an enlargement of the scope of work occasioned by damage that occurred after the 2012 covered loss, then the plaintiff may not recover that amount.

### IV.  Other Issues

The defendant raised four other requests for pretrial rulings in its trial brief seeking to further "narrow the issues" at trial. The defendant contends that (1) if the jury finds that the defendant did not breach the policy, then the policy must be enforced in its entirety, including the two-year repair window provision (effectively precluding the plaintiff from submitting any future claim for its full replacement cost); (2) if the jury finds that the plaintiff breached its duties under the policy by filing suit before submitting an estimate for repair of its damaged front main counter or high and low

voltage wiring, then it may not recover any amount for those line items in its proof of loss; (3) in order to recover any damages for mold remediation, the plaintiff must prove that there was mold under the lanes and any costs actually incurred to remediate it; and (4) because the sole dispositive question remaining for trial is whether the defendant breached the written contract of insurance, which comprised the entire agreement between the parties, the plaintiff should be precluded from offering at trial any "educational materials" or "claims handling guidelines" and should not be allowed to introduce any argument or evidence regarding alleged "bad faith" conduct by the defendant in processing the plaintiff's claim.

The plaintiff correctly points out that those issues are beyond the scope of the briefing that the Court directed.  Moreover, the first three added issues are untimely attempts by the defendant to seek partial summary judgment on questions that it could have raised earlier, but did not.  If the defendant desires to seek judgment as a matter of law on those items, it should attempt to do so by making an appropriate motion under Rule 50.  The fourth issue already has been addressed by the Court's ruling on the defendant's motions *in limine* on the same topics [dkt. #130, 133].  The Court denied the first motion regarding bad faith conduct, and it denied the second motion without prejudice, advising the parties that they "may raise at trial any objections to specific questions asked or items offered in evidence as they are presented."  Order [dkt. #206].

## V.  Conclusion

It is **ORDERED** that the plaintiff may not seek or obtain penalty interest under the Michigan Uniform Trade Practices Act, Mich. Comp. Laws § 500.2006, for the unpaid replacement costs of any property that it has not yet repaired or replaced.

-12-

It is further **ORDERED** that, upon proper proof, the plaintiff may seek recovery of the actual

costs for replacing its damaged property with other property of comparable material and quality,

subject to the previous rulings of this Court.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   August 11, 2015

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on August 11, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI
